# EXHIBIT B

# REPORT ON THE PURPOSE AND UTILITY OF A REGISTRATION SYSTEM FOR MILITARY SELECTIVE SERVICE



**Office of the Under Secretary of Defense for Personnel and Readiness**

---

The estimated cost of this report for the Department of Defense is approximately $51,000 in Fiscal Years 2016-2017.  This includes $0 in expenses and $51,000 in DoD labor. Generated on 2017Mar17; RefID: F-FE1E85C

# <u>TABLE OF CONTENTS</u>

**Page**

**Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

**Background**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

**The Selective Service System**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

> *The SSS maintains a registration structure and database*
> *ready for immediate use in in the event of a national emergency*. . . . . . . . . . . . . . . . . . **3**

> *The SSS regularly trains and exercises personnel and systems to*
> *ensure readiness to execute a draft.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**

**Actions Attending the Execution of a Draft**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**

> *Figure 1:  Structure of the Selective Service System.* . . . . . . . . . . . . . . . . . . . . . . . . . **7**

**Benefits Derived from the Military Selective Service System** . . . . . . . . . . . . . . . . . . **10**

> *Direct Benefits.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **10**

>> **The military selective service system guarantees the**
>> **certain and timely fulfillment of military manpower**
>> **requirements in a national emergency**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **10**
>> **The selective service registration database provides**
>> **valuable military recruiting leads**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**

> *Indirect Benefits* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**

>> **Registration reminds America's youth of the importance of**
>> **Military, National, and Public Service**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**
>> **Military selective service is a link between the AVF and society at large**. . . . . . **12**
>> **Military selective service is a symbol of national will and a**
>> **deterrent to potential enemies of the United States**. . . . . . . . . . . . . . . . . . . . . . . **13**

**The Extent to which Expanding Registration to Include Women**
**would Impact the Benefits of the Military Selective Service System**. . . . . . . . . . . . . . **14**

> *Direct Benefits Potentially Associated with Expanding Registration to Women* . . . . . . **17**

>> **The military selective service system guarantees the**
>> **certain and timely fulfillment of military manpower**
>> **requirements in a national emergency** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17**
>> **The selective service registration database provides**
>> **valuable military recruiting leads** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17**

i

*Indirect Benefits Potentially Associated with Expanding Registration to Women* . . . . . 18

Registration reminds America's youth of the importance of
Military, National, and Public Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
Military selective service is a link between the AVF and society at large . . . . . . . 18
Military selective service is a symbol of national will and a
deterrent to potential enemies of the United States. . . . . . . . . . . . . . . . . . . . . . . . . 18

*An Additional Benefit Potentially Associated with
Expanding Registration to Women* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

The registration of women would promote fairness and equity. . . . . . . . . . . . . . . 19

*Additional Resource Requirements to Register Women* . . . . . . . . . . . . . . . . . . . . . . . 19

**Functions Currently Performed by the SSS that Would Be Assumed
by DoD in the Absence of a National Registration Capability** . . . . . . . . . . . . . . . . . . . . 20

**Systems, Manpower, and Facilities Needed by DoD to Mobilize Inductees
in the Absence of the SSS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Systems* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Manpower* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Facilities* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

**Feasibility and Utility of Eliminating the Current Focus on Mass
Mobilization of Primarily Combat Troops in Favor of a System
that Focuses on Mobilization of Military Occupational Specialties.** . . . . . . . . . . . . . . . . 25

*Mobilization of General Combat Forces* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Mobilization by Military Occupational Specialties* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

**DoD Manpower Needs in the Event of an Emergency
Requiring Mass Mobilization.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Timeline* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Figure 2:  Notional Timeline for Mobilization.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Additional Critical Skills Needed* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

**Assumptions Used by the Department.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

**Conclusion.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

**Introduction**

Section 552 of the National Defense Authorization Act (NDAA) for Fiscal Year (FY) 2017 requires the Secretary of Defense to submit a report and on the current and future need for a centralized registration system under the Military Selective Service Act (MSSA)[1], to the Committees on Armed Services of the Senate and the House of Representatives and the National Commission on Military, National, and Public Service, for the purposes of assisting the Commission in carrying out its duties.  The law further requires that the report include:

- A detailed analysis of the current benefits derived, both directly and indirectly, from the Military Selective Service System, including:
  - The extent to which mandatory registration benefits military recruiting;
  - The extent to which a national registration capability serves as  a deterrent to potential enemies of the United States;
  - The extent to which expanding registration to include women would impact these benefits.

- An analysis of the functions currently performed by the Selective Service System that would be assumed by the Department in the absence of a national registration capability.

- An analysis of the systems, manpower, and facilities that would be needed by the Department to physically mobilize inductees in the absence of the Selective Service System.

- An analysis of the feasibility and utility of eliminating the current focus on mass mobilization of primarily combat troops in favor of a system that focuses on mobilization of all military occupational specialties, and the extent to which such a change would impact the need for both male and female inductees.

- A detailed analysis of the Department's manpower needs in the event of an emergency requiring mass mobilization, including:
  - A detailed timeline, along with the factors considered in arriving at this timeline, of when the Department of Defense (DoD) would require:
    - the first inductees to report for service;
    - the first 100,000 inductees to report for service; and
    - the first medical personnel to report for service.
  - An analysis of any additional critical skills that would be needed in the event of a national emergency, and a timeline for when the Department would require the first inductees to report for service.

- A list of the assumptions used by the Department when conducting its analysis in preparing the report.

---

[1] 50 USC 3801, *et seq*. [hereinafter MSSA].  The Military Selective Service Act (MSSA), first enacted as the Selective Service Act of 1948, establishes the Selective Service System (SSS) as an independent federal agency, responsible for delivering appropriately qualified civilian men for induction into the Armed Forces of the United States, as authorized by Congress.

## Background

Throughout most of the 20th century, the laws of the United States have obligated male citizens and residents to register for a draft administered by an agency of the federal government.[2]  Beginning with the Civil War and continuing through the Vietnam conflict, the federal government has episodically used draft calls and lotteries to mobilize military manpower for the Armed Forces.  On June 30, 1973, statutory induction authority expired[3] and in April 1975, then-President Gerald Ford temporarily suspended the registration requirement.[4]  The MSSA had not been repealed, however, and even as the military transitioned to the All-Volunteer Force (AVF), there remained in effect the requirement for a system and process ready to provide untrained manpower to the Armed Forces in the event of mass mobilization.[5]

In stark contrast to the "hollow force" of the post-Vietnam years, today's U.S. military is universally considered to be the most powerful and capable in the world.  Since its establishment in 1973, the AVF has proven its mettle in missions worldwide.  In the face of repeated combat deployments—including the crucible of the last 15 years of wars in Iraq and Afghanistan—the men and women comprising our AVF have distinguished themselves as well-disciplined, resilient, and lethal.

Comprised of Active Duty, Reserve, and National Guard personnel numbering approximately 2.1 million, the AVF has historically been manned, trained, and resourced to meet national security requirements.  However, the AVF was never intended to stand alone in time of national emergency.

In December 1979, the Soviet Union invaded Afghanistan, and in his January 1980 State of the Union address, then-President Jimmy Carter announced his intention to resume draft registration.  By Presidential Proclamation of July 2, 1980, Carter reestablished the requirement for all males aged 18 to 25 to register for military selective service.[6]  Unlike in previous registration regulations, however, men were not required to undergo immediate classification and evaluation for fitness to serve in the military.[7]

The DoD currently has no operational plans that envision mobilization at a level that would require conscription.[8]  Even in the face of sustained conflicts in Iraq and Afghanistan, DoD has maintained its ability to recruit and retain a professional volunteer force without resorting to a draft.  Some assert that the "revolution in military affairs" wrought by high-

---

[2] Kristy Kamarck, *The Selective Service System and Draft Registration: Issues for Congress* (Washington, DC: U.S. Library of Congress, Congressional Research Service, April 11, 2016) [hereinafter Kamarck, *Issues for Congress*], summary.

[3] Per Public Law 92-129, *An Act to amend the Military Selective Service Act of 1967; to increase military pay; to authorize military active duty strengths for fiscal year 1972; and for other purposes*, September 28, 1971.

[4] Presidential Proclamation 4360 (89 Stat. 1255).

[5] Kamarck, *Issues for Congress*, p. 11.

[6] For purposes of this report, the terms "selective service" and "military selective service" are used to refer to the program and process associated with registration of American men for induction into the Armed Forces in time of national emergency, as described in the MSSA.  The title Selective Service System (SSS) refers to the independent federal agency charged to administer and oversee the selective service program and process.

[7] Kamarck, *Issues for Congress*, p. 12.

[8] Joint Staff, J-5, November 17, 2016.

technology weapons and the advent of the cyber battlefield could obviate the need to mobilize manpower at the rates seen in the 20th century.[9]

Nonetheless, the potential for global conflict on the scale of another world war still exists. Every Administration since 1980 has made the conscious decision to maintain national registration for selective service as the tool through which Congress and the President would provide additional manpower to the Armed Forces—an "insurance policy"—should future threats spark requirements for forces in excess of those available to the AVF.

**The Selective Service System**

The Selective Service System (SSS) is an independent federal agency within the executive branch, headquartered in Arlington, Virginia.  Since 1973, the MSSA has designated the SSS as an "active standby" organization, with the mission to:

- maintain a complete registration and classification structure capable of immediate operation in the event of a national emergency (including a structure for the registration and classification of persons qualified for practice or employment in a health care occupation essential to the maintenance of the Armed Forces); and

- maintain personnel adequate to reconstitute immediately the full operations of the System, including military reservists who are trained to operate such System, and who can be ordered to active duty for such purposes in the event of a national emergency.[10]

The report addresses each of these missions, in turn.

*The SSS maintains a registration structure and database ready for immediate use in in the event of a national emergency*.  In accord with then-President Carter's proclamation, selective service registration resumed in 1980.  The MSSA requires registration by most male citizens and residents of the United States who are at least 18 years of age, and not yet 26.  A man must register within 30 days of his 18th birthday and update his registration within 10 days of a change in address.  Individuals are not permitted to register beyond their 26th birthday. Under current law, women may serve voluntarily in the U.S. Armed Forces but are not required to register with the SSS.

The SSS processes more than 2.3 million new registrations annually and regularly updates registrants' addresses using self-reported information and automatic data feeds from other federal and state agencies.  Most registration is accomplished on-line through the SSS website[11] and automatically via electronic data sharing arrangements with other federal and state

---

[9] David Barno and Nora Bensahel, *Mirages of War:  Six Illusions from our Recent Conflicts*, War on the Rocks, April 11, 2017 [hereinafter, Barno and Bensahel, *Mirages of War*].
[10] MSSA, section 10(h).
[11] Selective Service System website, https://www.sss.gov.  The website also serves as a public and intra-governmental interface that connects external and internal audiences and serves as a portal for access to information about SSS plans, policies, and initiatives.

3

agencies[12] that administer benefits for which selective service registration is a prerequisite.[13] Registration also may be accomplished using the Interactive Voice Response system at the SSS National Call Center[14], and by paper forms available from the U.S. Postal Service.[15]  The SSS engages with U.S. Embassies and consulates around the world in an effort to ensure that U.S. nationals living abroad are aware of registration requirement; approximately 40,000 registrations annually are from foreign addresses.  Because the peacetime authority of the SSS does not extend to the classification or examination of registrants, all of those registered would generally be considered to be "available for service" in the case of a draft, at which time they could be reclassified or determined unfit.[16]

In calendar year 2015, the overall registration compliance rate for men ages 18 through 25 was 91 percent.[17]  Compliance is monitored and enforced through a variety of mechanisms, including crosschecks with the Social Security Administration, the Internal Revenue Service, state motor vehicle departments, and other federal and state agencies that administer benefits for which selective service registration is a prerequisite.  Men who fail to register may be subject to criminal penalties, loss of eligibility for federal or state jobs and education benefits, and denial of a security clearance.  Documented or undocumented immigrants who fail to register may not be able to obtain United States citizenship.

---

[12] The SSS reports that in FY 2016, approximately 22 percent of its electronic registrant data was collected by the Department of Education as part of the student aid application process.  The application for federal student aid includes a "register me" checkbox that facilitates the automatic selective service registration of males.  In cooperation with U.S. Citizenship and Immigration Services, immigrant men ages 18 through 25 who are accepted for permanent U.S. residence are registered automatically; men of registration age who apply for an immigrant visa through the Department of State are also automatically registered.  40 states, 3 territories, and the District of Columbia have enacted legislation that provides for automatic registration of males of age at the time they apply for a driver's permit, license, or other form of state identification.  In FY 2016, more than 1 million young men registered electronically through their state Department of Motor Vehicles.  *See* SSS Report to the Congress of the United States for FY 2016, p. 8.  *See generally Kamarck, Issues for Congress*, pp. 15-17.

[13] For example, in November 1985, the *Thurmond Amendment* to the Defense Authorization Act established Title 5, U.S. Code, Section 3328, which requires a male to register with the selective service as a prerequisite for appointment to most federal jobs.  The *Solomon Amendment* added Section 12(f) to the Military Selective Service Act in September 1982.  Male students who have a requirement to register for the draft must do so as a precondition to receipt of Title 4 federal student financial aid, which includes such need-based programs as Guaranteed Student Loans and Pell Grants.  And, on November 6, 1986, President Reagan signed into law the Immigration Reform and Control Act, requiring males between the ages of 18 and 26 who applying for legalization under the act to register for selective service had they not already done so.

[14] The telephonic Integrated Voice Response system accounts for an average of 21,000 annual registrations.

[15] In FY 2016, only 3 percent of all registrations—78,000—were from paper forms "direct mailed" to potential registrants or distributed through the U.S Postal Service and returned via its "mail back" program.  The SSS ensures that the U.S. Postal Service is regularly stocked with a supply of registration and change of address forms for use in its nearly 32,000 post offices.  This program facilitates registration by young men who do not have access to the internet, and have neither a driver's license nor a social security number.  Young men who enlist or access into the military are automatically registered.  *See* SSS Report to the Congress of the United States for FY 2016, p. 6.

[16] Although putatively labeled as "available for service", in actuality many registrants could be eligible for postponement, deferment, or exemption from service.  Further, many may not meet the military's physical, mental, or moral suitability standards.  The classification and examination processes responsible for such determinations would be initiated only were a draft to be directed.

[17] SSS Report to the Congress of the United States for FY 2016, p. 5.  It appears that calendar year 2015 is the last year for which complete data is available.

The backbone of the registration process is the database of registrants maintained at the SSS Data Management Center (DMC), located north of Chicago, Illinois.[18]  The registration database, on which the conduct of any future draft would rely, includes approximately 17 million records of men in the primary draft pool (18-25 years old), 22.5 million registrants in the extended pool (26-35 years old), and 45.5 million men 36-80 years old.  With holdings totaling about 85 million records—the DMC maintains one of the largest databases of personally-identifiable information in the federal government.[19]

In peacetime, the database is used primarily to verify the registration of males who apply for federal or state employment or benefits, eligibility for which is conditioned on draft registration.  To a great degree, data sharing is automated and automatic.  Through its Registration, Compliance, and Verification tool, the SSS both provides data to, and receives data from, other government agencies, including the Department of Labor, the Department of Education, the Department of State, the United States Citizenship and Immigration Services, the DoD, and the Alaska Permanent Fund.  Information received from these agencies is matched against existing database records; if no record exists, one is created and the SSS uses the information to reach out to individuals and remind them of their obligation to register.[20]  Each year, the SSS provides the names, addresses, and Social Security Numbers of men aged 18 through 25 to the U.S. Census Bureau for its inter-census estimate program.  Also annually, the SSS provides the Department of Justice with a list of individuals who are required to register, but have failed to do so.[21]

***The SSS regularly trains and exercises personnel and systems to ensure readiness to execute a draft.***  The field structure of the SSS is grounded in 2,069 *local boards* staffed with 11,000 volunteer board members—located in almost every county of the United States and its territories.  Each local board must be prepared to administer the registrant classification process in the community it serves and take action on any claims or appeals that arise.  Board members must be trained in applicable regulations and procedures so that, if a draft is reinstated, they will be able to fulfill their obligations fairly and equitably, ensuring that registrants' rights to due process are protected.  Board members receive annual training in which they review and adjudicate sample cases similar to real-life situations.  The SSS board structure also includes 96 District Appeal Boards and one National Appeal Board.  In the event of a mass mobilization, the SSS would draw on more than 500 Reserve Force Officers, 1,500 military retirees recalled to duty, 700 State Resource Volunteers, and 6,500 newly-hired federal employees to support the execution of a draft.[22]  Preparedness efforts span the entirety of the SSS, encompassing all

---

[18] Kamarck, *Issues for Congress*, p. 22.

[19] SSS Report to the Congress of the United States for FY 2016, p. 18.

[20] *Id.*

[21] *Ibid* at p. 18.  Annually, the SSS forwards to DoJ a list of roughly 630,000 names and addresses of men aged 19-30, who have either evaded registration or refused to register.  In practice, there have been no criminal prosecutions for failure to register since January 1986.

[22] *See generally*, Selective Service System website, https://www.sss.gov.  The SSS now manages all of its personnel through the agency's three region headquarters located in North Chicago, Illinois, Marietta, Georgia, and Denver, Colorado.  These regions are responsible for maintaining readiness at the grassroots level.  They also manage the activities of the agency's 56 State Directors, conduct training for Reserve Forces Officers and civilian board members, and ensure the local boards and District Appeal Boards are staffed.  The regions also directly support the SSS's goal of increasing registration compliance through local registration awareness programs.

functions necessary to maintain the mass mobilization infrastructure in a state of preparedness, transition it to full operational status, and manage it to accomplish the mobilization mission.

**Actions Attending the Execution of a Draft**

Although these processes could be modified for implementation in a future draft, past experience and current planning by the SSS indicate that the following actions, in the following sequence, likely would attend the execution of a draft.[23]

*Congress and the President authorize mass mobilization.*  Should a crisis occur that requires more troops than the AVF can supply, a draft may be initiated only after the Congress passes and the President signs enabling legislation.  The President cannot initiate a draft on his own.  Congress would first have to pass authorizing legislation, and the President would have to sign the bill into law.

*All components of the SSS are activated.*  In the event of a return to conscription, the SSS would expand significantly and technology links between all SSS locations and components would be activated.  The structure of the SSS is illustrated in *Figure 1.*

- 56 presidentially-appointed State Directors would establish *State Headquarters* at designated National Guard armories to provide operational management for induction processing and operation of the Alternative Service Program within the state.

- 436 *Area Offices* would begin opening in select recruiting station offices across the United States, with the support of more than 500 Reserve Force Officers representing all branches of the Armed Forces, 1,500 noncommissioned officers recalled from retirement, and 700 State Resource Volunteers.  Area Offices are authorized to classify registrants into an administrative class (e.g., exemption to perform service in the National Guard, exemption as a "sole surviving son")[24], issue decisions on postponements[25], and will serve as an intake point for claims or appeals filed by registrants who have been ordered to report for examination or induction.

- 2,069 *local boards* would be activated throughout the Nation, staffed by more than 11,000 volunteers.  The local board will serve as the initial classifying authority for judgmental classifications (e.g., exemption as a conscientious objector, deferment for familial hardship, exemption as a minister) and will adjudicate claims or appeals of administrative classification and postponement decisions rendered by Areas Offices.[26]

---

[23] *See generally* Selective Service System website, https://www.sss.gov.

[24] 32 Code of Federal Regulations, part 1633.1(f).

[25] For example, a college student may have his induction postponed until he finishes the current semester or, if a senior, until the end of the academic year; a high school student may have his induction postponed until he graduates or reaches age 20.  32 Code of Federal Regulations, part 1624.6.

[26] 32 Code of Federal Regulations, part 1633.1(d) and (e).

*Figure 1: Structure of the Selective Service System*



- The MSSA and federal regulations mandate the creation and establishment of at least one District Appeal Board in each of the 96 Federal judicial districts in the United States.[27]  A District Appeal Board, consisting of three or more members, has the jurisdiction to review, and to affirm or change, any local board decision appealed to it.

---

[27] MSSA, Section 10(b)(3).

If a District Appeal Board denial is not unanimous, the case is reviewed and determined by a five-member National Appeal Board in Washington, D.C.[28]

*A lottery is conducted.*  An early step in the resumption of the induction process would be the conduct of a random drawing of dates of birth, to determine the sequence in which registrants of prime draft age would be called for processing for induction.  For a conventional draft of "untrained" manpower, a man is in the first priority during the calendar year of his 20th birthday.  The first to be called, in the sequence of birthdays determined by the lottery, will be men whose 20th birthday falls during that year, followed, if needed, by men aged 21, 22, 23, 24 and 25.  18-year-olds and those turning 19 probably would not be drafted.  Each year, as a man ages, he shifts into a lower-priority group.

*Registrants are classified.*  Classification is the process of determining who is available for military service and who is deferred or exempted.  Registrants are not classified during peacetime, but in a national emergency requiring mass mobilization directed by the President and Congress, would be placed into categories based on their eligibility for military service.  Initially, each registrant is presumed to be classified as "1-A" (available for unrestricted military service), unless and until they file a claim or appeal and are granted temporary deferment or permanent exemption in one of 21 different *administrative* (e.g., postponements to allow completion of education, deferral due membership in the National Guard, exemption as a "sole surviving son") or *judgmental* (e.g., exemption as a conscientious objector, deferment for familial hardship, exemption as a minister) categories.  Classifications are based on each registrant's individual circumstances and beliefs.

The following *administrative* classification categories are among those available under extant policies and procedures[29]:

- *Members of Reserve Components* (including members of the National Guard and senior Reserve Officers' Training Corps cadets or midshipmen who have contracted to accept a Reserve commission) may perform service in the National Guard or Reserves.

- A *surviving son or brother* in a family in which the parent or sibling died as a result of U.S. military service, or is in a captured or missing in action status, is exempt from service.

- *Officials deferred by law,* including state governors, members of federal and state legislative bodies, and U.S. Court Judges, are exempt from service for as long as they continue to hold office.

- *Immigrants and dual nationals* may, in some cases, be exempt from U.S. military service, depending upon their place of residence and country of citizenship.

---

[28] 32 Code of Federal Regulations, part 1633.
[29] 32 Code of Federal Regulations, parts 1602.2 and 1630.

The following *judgmental* classification categories are among those available under extant policies and procedures[30]:

- *Conscientious objectors* perform service to the Nation in a manner consistent with their moral, ethical, or religious opposition to participation in war in any form.[31] Depending upon the nature of his beliefs, a conscientious objector serves in either a noncombatant capacity in the armed forces or a civilian job contributing to the national interest. The SSS administers an *Alternative Service Program* for conscientious objectors who are required to perform civilian service in lieu of serving in the military. Working with and through the *Alternative Service Employment Network,* the SSS identifies and approves employers ready to offer job placement to a classified conscientious objector in one of six approved occupations: health care services, educational services, environmental programs, social services, community services, or agricultural work. The employer supervises a conscientious objector's work and manages his 24-month period of alternative service.

- *Hardship* deferments are available for men whose induction would result in hardship to family members who depend upon them for support. Such deferments are limited to 365 days.

- *Ministers of Religion* are exempt from service.

***Registrants are evaluated for physical, mental, and moral suitability for military service***. Registrants with low lottery numbers are ordered to report to a U.S. Military Entrance Processing Station (MEPS) for a physical, mental, and moral evaluation to determine whether they are fit for military service. Those who pass the military evaluation will receive induction orders. An inductee will have 10 days to report to the local MEPS for induction.

***Claims and appeals are adjudicated.*** If a registrant believes that for some reason he cannot or should not report for examination or induction as directed, he may request a postponement or reclassification by filing a claim and sending it to the *Area Office* supporting his *local board* of jurisdiction. The Area Office's receipt of such a claim delays the registrant's induction until his claim has been fully processed and adjudicated. Local board members will begin reviewing and deciding the outcome of the individual's claims. Board members may personally interview the registrant and persons who know him to gain a better understanding of his situation. A man may appeal a local board's decision to a District Appeal Board, and subsequently to the National Appeal Board.

***Draftees are inducted into the military***. According to current SSS plans, the first inductees must be delivered to the military within 193 days from a mass mobilization order.

Given this background, we now consider the specific matters posed by Congress in section 552 of the NDAA for FY 2017.

---

[30] 32 Code of Federal Regulations, parts 1602.13 and 1630.
[31] 32 Code of Federal Regulations, part 1636. During the Vietnam conflict, an estimated 3 percent of inductees submitted judgmental claims for conscientious objector status.

**Benefits Derived from the Military Selective Service System**

*Direct Benefits*

The military selective service system guarantees the certain and timely fulfillment of military manpower requirements in a national emergency. Should mass mobilization be directed by the President and Congress, the selective service process is prepared to support DoD manpower requirements through the conduct of a fair and equitable draft. The SSS and the registration database provide the structure to support a mass mobilization that will rapidly increase the size of Service forces. This is not a theoretical capability. In the last three major engagements before the draft was abolished, the military selective service system provided DoD with nearly 13.5 million men to fight and win our Nation's wars: from 1940 to 1946 in World War II (10,021,279 inductions); from 1950 to 1953 in Korea (1,681,820 inductions); and from 1954 to 1973 in Vietnam (1,766,910 inductions).

The United States must always retain the ability to respond to the "catastrophe yet unanticipated."[32] Maintaining the systems, infrastructure, and processes required to conduct a draft provides a strategic "shock absorber"[33] that will enable the country to mobilize parts or all of society in the face of a crisis of existential proportions—or in the words of then-President Reagan, "a relatively low-cost 'insurance policy' against our underestimation of the maximum level of threat we expect our Armed Forces to face."

Since the SSS resumed registration in 1980, each Administration has preserved the agency and its programs, with the realization that *it is the only* proven, time-tested mechanism by which to expand the AVF in the event of a national emergency. At present, 91 percent of U.S. men 18 to 25 years old have registered with the SSS—nearly 17 million names and addresses are on file for men in the primary age group for draft. The extended database for men aged 26 to 35 years contains the names and addresses of nearly 22.5 million registrants. The registration database itself mitigates risk to the Nation; its very existence would reduce the time required for full defense mobilization. More importantly, the vast pool of human capability represented in and by the database stands ready to be called to bridge a potential capacity gap between the AVF and the force requirements of a conflict of global proportions or mammoth national emergency. Even though such scenarios remain unlikely, the consequences of being unable to wage such a war or respond to such a crisis would prove disastrous.[34] A proven national program of selective service facilitates military manpower planning for an unknown future, particularly when contemplating the most likely and/or most dangerous national security scenarios.

No one can predict the future of war. As then-Secretary of Defense Robert Gates once quipped, since the Vietnam conflict, the United States has a perfect record of predicting the next war: "we have never once gotten it right." The prospect of a future draft—and the readiness of

---

[32] Attributed to then-Secretary of Defense Chuck Hagel, 2013.
[33] David Barno and Nora Bensahel, *Why We Still Need the Draft*, War on the Rocks, February 23, 2016 [hereinafter Barno and Bensahel, *Why We Still Need the Draft*].
[34] *Id.*

the underlying systems, infrastructure, and processes to effect it—serve as a quiet but important hedge against an unknowable future rife with ever-changing threats to the Nation.[35]

       <u>The selective service registration database provides valuable military recruiting leads</u>. The continued existence of the requirement that young males register for military selective service allows DoD and the Services to concentrate their recruiting resources on manning the current AVF, with the confidence that the SSS can provide a vast influx of manpower if needed in a national emergency.  Further, registration, once used only for conscription, now functions as a rich source of information for military recruiting.  The selective service process engages more than 2 million enlistment-eligible males annually through routine registration and compliance actions.  On a monthly basis, the SSS provides the DoD Joint Advertising and Market Research Studies Office (JAMRS) the names, addresses, and dates of birth of *all* new registrants—more than 2.3 million in FY 2016 alone—to be used by DoD for recruiting purposes.  In turn, working through the Military Service Recruiting Commands, JAMRS forwards hundreds of thousands of timely leads to military recruiters from young men potentially eligible for military service.  In addition, every man who registers with the SSS receives a registration acknowledgement letter and registration card in the mail.  Per agreement with DoD, the SSS inserts in this mailing a "joint lead" generation card developed by JAMRS on behalf of all the Services.  Annually, the "joint lead" generation card generates approximately 75,000-85,000 recruiting leads from men interested in the possibility of volunteering for service.

       Although some have rightly suggested that JAMRS could obtain the names, addresses, and dates of birth of enlistment-eligible males through the purchase of data from commercial vendors—JAMRS purchases such databases as a means of securing information about enlistment-eligible females—recruiting experts believe that the "joint lead" generation card remains their most valuable source of new, "high propensity" leads.  When a young man receives his registration acknowledgement in the mail and extracts the "joint lead" generation card, he inevitably must consider, if only for the briefest of moments, the possibility of military service.  For some, the card and the thought are quickly set aside; for others, the moment induces an openness to, and curiosity about, the prospect of service—a consideration of one's options as an adult and duty as a citizen.  As a recruiting tool, the anonymous ease associated with culling the names of potential leads from a commercial database pales in comparison to the import and effect of that tangible "moment" at which a young man reviews the card and first thinks to himself, "maybe I could do that".[36]

       The links to benefit programs that enlistment-eligible youths hold dear—such as student loan eligibility, federal employment opportunities, and the naturalization process—associate selective service registration with positive outcomes that may help influence their propensity to serve.  In addition, the registration system provides opportunities for key influencers to engage

---

[35] *Id.*

[36] In the context of recruiting, it is critical to build in potential recruits a belief in their "self-efficacy" related to military service.  "Self-efficacy" is defined generally as one's belief in one's ability to succeed in specific situations or accomplish a particular task.  One's sense of self-efficacy is believed to play a major role in how one approaches goals, tasks, and challenges.  In general, a potential recruit who reviews the "joint lead" generation card, or other recruiting media and believes "maybe I can do that" is more likely to pursue additional information about military service.

with the targeted population.  For example, 18,218 of the Nation's 20,989[37] targeted high schools—an 87 percent participation rate—participate in the selective service High School Registrar Program, affording an opportunity for civic-minded school officials to both encourage registration compliance and discuss with eligible students the positive aspects of military service.[38]

### Indirect Benefits

Registration reminds America's youth of the importance of Military, National, and Public Service.  The military selective service registration process empowers America's young men. The voluntary act of registration by a young man on or around his 18th birthday has been, and will continue to be, an opportunity for young American men and male immigrants to consider deliberately a future of military service, and to act accordingly.  By registering with the SSS, every young man is reminded of the possibility that in a time of emergency, he may be called to arms in the defense of his nation.  As then-Secretary of Defense Chuck Hagel stated in May 2013, registration "remind[s] our youth that public service is a valuable part of American citizenship."  Even more, registration is a reminder to all it touches—a registrant's family, teachers, clergy, and other influencers—that military, national, and public service are inherent obligations of citizenship in a free society.

Military selective service is a critical link between the AVF and society at large.  Selective service is a lone, slender thread[39] that connects all U.S. citizens to their military.  By reinforcing the fundamental responsibility of all citizens to defend the country in times of crisis, the possibility of a draft links the entirety of the American people to our Nation's wars, and the risks of military service in those wars.[40]

Fewer than 1 percent of Americans today serve in uniform.  As the conscripts of World War II, Korea, Vietnam, and the Cold War fade away, the veteran population is declining in both actual size and the percentage of society it inhabits.[41]  Congress and the media make much of the fact that today, fewer Americans have a personal connection to the military than at any time in the past several decades—the gap between the American people and their military is growing ever larger.  The MSSA restates the sense of Congress that "in a free society, the obligations and privileges of serving in the armed forces . . . should be shared generally"[42].  But the general public's "[reliance] on others—self-selected volunteers—to fight for the Nation has slowly become an accepted norm."[43]

---

[37] High School Facts at a Glance: Number of Institutions.  Across the United States there are 26,407 public secondary schools and 10,693 private secondary schools.  (Digest of Education Statistics, 2001, Table 89, June 18, 2014).  However, the SSS High School Registrar's program targets only those schools with male students; therefore, the number of high schools cited is less than the total combined number of public, private, charter, parochial, and vocational secondary schools.

[38] SSS Report to the Congress of the United States for FY 2016, p. 2.

[39] Barno and Bensahel, *Why We Still Need the Draft*.

[40] *Id.*

[41] Phillip Carter, *99 Problems But a Draft Ain't One*, War on the Rocks, December 3, 2013 [hereinafter, Carter, *99 Problems*.]

[42] MSSA, Section 1(c).

[43] Barno and Bensahel, *Why We Still Need the Draft*.

As fewer and fewer members of our society have direct military experience, it becomes increasingly important to maintain the link between the AVF and our society at large.  The men and women of today's Armed Forces must know that the general population of our country stands behind them, committed to sharing the risks and burdens of military service, should the preservation of our national security so require.

Absent the possibility of a draft, however remote, the American people will grow ever more distant from the military, from the need to think about America's changing role in a dangerous world, from the debates by their elected leaders on the use of force, and most importantly, from the always ready decision to go to war.[44]  In contrast, conscription would instantly link every family with a draftee in the force—or with a son, husband, father, or brother at risk of being drafted—to the military.[45]  Maintaining the ability to mobilize the larger nation to fight when necessary, and the will of all to share personally in the hardships of war, is an essential link between the AVF, our society at large, and the preservation of our democracy.

Military selective service is a symbol of national will and a deterrent to potential enemies of the United States.  Maintaining military selective service sends a strong signal to potential adversaries that the United States is willing to draw on the full depth and breadth of its national resources, if and when necessary to wage war.  The mere existence of the SSS and the registration requirement serve as a symbol to the world of our Nation's resolve and preparedness.  Those in favor of then-President Carter's 1980 decision to reestablish draft registration argued that it sent an unequivocal message to the Soviet Union that the United States was prepared to act to defend its interests.[46]  In 1994, then-President Bill Clinton stated, ". . . terminating . . . draft registration now could send the wrong signal to our potential enemies who are watching for signs of U.S. resolve."  And in 2012, then-President Barack Obama described the registration system as having "both military and symbolic significance."

Beyond symbolism, selective service signals—to allies and potential adversaries alike—the depth of U.S. commitment to the defense of our nation and its interests.  Of reassurance to our allies, this signal has a deterrent effect on our nation's enemies.  "Deterrence is not only a function of current power; it also includes the nation's potential power when galvanized."[47]  Active registration and compliance processes provide a rock-solid foundation for a national strategic reserve, setting the conditions for timely and certain access to the full weight of manpower that may be required to defend ourselves and our treaty partners.  Even considering only the 17 million men aged 18 through 25 whose names and addresses are recorded in the registration database, our enemies cannot help but be struck by the sheer mass of human force the United States could leverage.  Through registration and the mobilization capability it promises, America demonstrates the public will and the practical ability to fight and win our Nation's wars.

Any decision with respect to the program of selective service—whether to sustain, modify, reaffirm, expand, or terminate registration—will send a signal to the world and have an

---

[44] *Id.*

[45] Carter, *99 Problems.*

[46] Kamarck, *Issues for Congress*, p. 12.

[47] Barno and Bensahel, *Why We Still Need the Draft.*

impact on deterrence, one way or the other.  Maintaining the mechanism to implement conscription in times of crisis, ensures that the United States stands ready to send an indisputable signal of national resolve by choosing to initiate a draft, even one of modest size.[48]  In contrast, eliminating military selective service could be interpreted by adversaries of the United States as a potential weakness, thus emboldening existing or potential enemies.

**The Extent to which Expanding Registration to Include Women would Impact the Benefits of the Military Selective Service System**

As previously noted, under current law, women may serve voluntarily in the U.S. Armed Forces but are not, and never have been, required to register for selective service.  In fact, the language of the MSSA and its implementing regulations prohibit the SSS from registering women.[49]  Before considering the effects of requiring women to register, it is appropriate to consider why women are currently exempt from this requirement.

Then-President Carter's 1980 proposal to reinstate draft registration was originally accompanied by proposed legislative language that would have modified the MSSA to authorize the registration of women.[50]  In justifying his proposal, the then-President Carter explained:

> "My decision to register women is a recognition of the reality that both women and men are working members of our society.  It confirms what is already obvious throughout our society—that women are now providing all types of skills in every profession.  The military should be no exception. [. . .] There is no distinction possible, on the basis of ability or performance, that would allow me to exclude women from an obligation to register."[51]

Congress rejected the then-President Carter's proposal, with an explanation in Title VII of Senate Report 26-826:

> "[T]he starting point for any discussion of the appropriateness of registering women for the draft is the question of the proper role of women in combat.  The principle that women should not intentionally and routinely engage in combat is fundamental, and enjoys wide support among our people.  It is universally supported by military leaders who have testified before the committee, and forms the linchpin for any analysis of this problem. [. . .] Current law and policy exclude women from being assigned to combat in our military forces, and the committee reaffirms this policy.  The policy precluding the use of women in combat is, in the committee's view, the most important reason for not including women in a registration system."

---

[48] *Id.*

[49] MSSA, Section 3(a).  As presently written, the law refers specifically to "male persons", in stating who must register and who is susceptible to draft.  Implementing regulations at 32 Code of Federal Regulations, part 1615.5 provide that Federal regulations state, "[n]o person who is not required by selective service law or the Proclamation of the President to register shall be registered."  For women to be required to register with Selective Service, Congress would have to amend the law.

[50] Kamarck, *Issues for Congress*, p. 13.

[51] Statement of the President, Office of the White House Press Secretary, February 8, 1980.

In the 1981 case of *Rostker v. Goldberg*[52], the Supreme Court ruled on a challenge to the exemption of women from selective service registration, upholding the constitutionality of the Nation's practice of registering only men.  Writing for a majority of the Court, Justice William Rehnquist reasoned:  "The existence of the combat restriction clearly indicates the basis for Congress' decision to exempt women from registration.  The purpose of registration was to prepare for a draft of combat troops.  Since women are excluded from combat, Congress concluded that they would not be needed in the event of a draft, and therefore decided not to register them."

Beginning in 2012, the DoD gradually began to eliminate prohibitions on the assignment of women to direct ground combat.  Following a unanimous recommendation by the Joint Chiefs of Staff, then-Secretary of Defense Leon E. Panetta announced, on January 24, 2013, the end of the direct ground combat exclusion rule for female service members.  The Military Services began planning to eliminate all unnecessary gender-based barriers to service and in the ensuing two years, opened more than 300,000 new military occupations and duty positions to women.  Finally, on December 3, 2015, then-Secretary of Defense Ashton Carter promulgated a crowning policy that opened *all* military occupational specialties to women and removed all final restrictions on the service of women in combat.  Qualified women were eligible to participate in all career fields, in all duty positions, at all echelons of the Armed Forces.

In advance of this all-encompassing change, the Department was required, by statute, to provide a report to Congress, analyzing the policy's legal implications for the MSSA.  In December 2015, DoD advised Congress that the impending change "further alters the factual backdrop" underpinning *Rostker*, but took no further stance on the legal issues raised by then-Secretary Carter's decision to open all military positions to women.

The year that followed saw the appointment of the first female Combatant Commander.  Women graduated from the Army's elite Ranger school, served on Navy submarines, and completed Marine Corps Artillery officer's training.  The shift also enabled the Department to expand its recruiting reach to the entirety of the American population and to enlist qualified personnel, both male and female, for service in combat occupations.  And, in the context of a mass mobilization, this change would permit the Department to place any qualified person—male or female—in any position, in any Service, to meet the manpower demands of any mission.

Since the ban on women in combat was lifted, the merits of including women in the requirement to register for the draft have been hotly debated in the media and in the halls of Congress.  In December 2016, then-Secretary of Defense Carter stated publicly:

"While I strongly support our all-volunteer approach and do not advocate returning to a draft, I do think it makes sense for women to register for selective service at this time.  With all combat positions now open to women, we need to have access to 100-percent of America's population for our all-volunteer force to be able to recruit the most qualified individuals and remain the finest fighting force the world has ever known."

---

[52] *Rostker v. Goldberg,* 453 U.S. 57 (1981).

Other senior military leaders from across the Services made similar personal statements in favor of registering women for the draft.[53]

A December 2016 survey asked respondents for their views on requiring women to register for a possible military draft.  About one-half (49 percent) of respondents would support requiring women to register for the military draft; only 14 percent would oppose the mandatory registration of women.[54]  These "support" or "oppose" survey choices do not reflect the breadth of public opinion on the issue, however.

At least two challenges to the current law excluding women from registration have been raised:  one lawsuit contending that the male-only draft is unconstitutional, the other claiming that the exclusion of women from the draft is unlawful discrimination.  On a broader level, some believe that women cannot be equal in society as long as they are barred from full participation in all levels of the national security system and thus should be *allowed to* register for the draft.[55]  Others argue that equal access to combat jobs should *oblige* women to take equal responsibility for registering for military selective service and potentially being assigned to combat roles in the event of a draft.[56]  But as things stand currently, the legal effect of removing all restrictions on the assignment and utilization of women in the Armed Forces on the constitutionality of a male-only draft registration requirement, has yet to be determined.

Some argue that the preservation of the national security does not require the service of our country's women.  Recruiting studies estimate that only 29 percent of today's youth qualify for entry into the military, for a variety of educational, medical, criminal justice and other reasons.[57]  In rough proportion, were the United States to draft only 5 million of the 17 million men of primary draft age, the resultant force would far exceed the foreseeable manpower requirements of all but the most global of conflicts.[58]

Others suggest that women should be obliged to enroll in the selective service system, but should not be forced into combat roles on the occasion of a draft.  But any such exemption for women would raise fairness concerns for men, who would not have the same opportunities to opt out of combat assignments.  And, making the choice not to serve in combat available to both male and female draftees would undercut the very purpose of the endeavor.[59]

Those who are opposed to a requirement for women to register suggest that it is not fair and equitable for women to be placed in the same roles as men because women do not have the same physical capabilities as the average man and thus would have a lower probability of survival if forced to serve in direct ground combat roles.  To this, they add that it would be

---

[53] Both General Mark Milley, Army Chief of Staff, and General Robert Neller, Commandant of the Marine Corps, have publicly stated that all eligible and qualified men and women should be required to register for the draft. Lamothe, Dan, "Army and Marine Corps Chiefs:  It's time for women to register for the draft", *The Washington Post*, February 2, 2016.

[54] Joint Advertising Market Research and Studies, Current Events Tracker, December 2016.

[55] Kamarck, *Issues for Congress*, p. 26.

[56] Barno, David and Bensahel, Nora, "Now Women Should Register for the Draft, *Time*, December 7, 2015.

[57] Joint Advertising Market Research and Studies, Quality of Military Accessions, 2014.

[58] *See generally* Carter, *99 Problems.*

[59] Kamarck, *Issues for Congress*, p. 26.

inefficient to draft thousands of women when only a small percentage would be physically qualified to serve as part of a combat troop. Those in favor of female draft registration riposte that future wars may have greater requirements for more technical skills in non-combat fields, for which the percent of individuals qualified would not be as variable by gender.[60]

Finally, from a theological or moral perspective, some say that it is wrong for women to serve in combat roles; given that a draft would most likely be used to fill positions for combat operations, women should be exempt from registering. This argument resonates strongly with a segment of the U.S. population. Were women required to register for selective service, it could significantly increase public opposition to the conduct of a draft and degrade public support for engaging in a conflict that could require one.[61] This leads to perplexing questions as to the potential draft classification of both men and women who hew to these perspectives, and whether such beliefs could translate into a form of conscientious objection to service in a mixed gender combat unit.

With this background in mind, we now address the potential effects of expanding registration to include women on the direct and indirect benefits of military selective service.

### Direct Benefits Potentially Associated with Expanding Registration to Women

The military selective service system guarantees the certain and timely fulfillment of military manpower requirements in a national emergency. It would appear imprudent to exclude approximately 50 percent of the population—the female half—from availability for the draft in the case of a national emergency. Future wars may have requirements for skills in non-combat fields in which the percentage of individuals qualified would not be as variable by gender. A broader, deeper registrant pool would enhance the ability of the SSS to provide manpower to the DoD in accordance with its force needs. This is particularly important because future wars may have requirements for skills in non-combat fields in which the percentage of individuals qualified would not be as variable by gender.[62] And, if a draft becomes necessary, the public must see that it is fair and equitable. For that to happen, the maximum number of eligible persons must be registered.

The registration database provides valuable military recruiting leads.[63] Requiring the registration of women would substantially increase the number of leads provided to Service recruiting organizations, effectively doubling the name and address data transferred monthly from the SSS to the DoD. The DoD-developed "joint lead" generation card enclosed in SSS mailings of acknowledgement letters to males who have registered, generates approximately 75,000-80,000 male leads annually. The Department anticipates that female registration could generate an additional 35,000-40,000 annual female leads, providing a significant boost to military recruiters, particularly given that female applicants tend to meet quality benchmarks at higher rates than do males.[64] If the discernable positive recruiting effects on males associated

---

[60] *Ibid*, p. 27.

[61] *Id.*

[62] Kamarck, *Issues for Congress*, p. 26.

[63] The potential for sharing a "total citizen database" with other National Service Organizations, such as USA Freedom Corps, Citizen Corps, AmeriCorps, and America's Promise, has yet to be explored.

[64] Joint Advertising Market Research and Studies, Joint Leads Study, 2009.

with reviewing the "joint lead" generation card—the "maybe I can do that" moment in which the possibility of military service is rendered tangible—translate as expected to a female registrant population, the number of female leads, motivated by the sense of self-efficacy, could be even higher.  That all military positions are now open to women also may influence an increase in leads among women registrants curious about, or having a propensity for service in combat occupations, and inspired by the equal opportunity now afforded both men and women who can meet the military's tough standards.[65]  As an aside, DoD currently pays commercial vendors for data to generate female leads; this practice could be discontinued, rendering a small cost savings to the Department.[66]

### *Indirect Benefits Potentially Associated with Expanding Registration to Women*

Registration reminds America's youth of the importance of Military, National, and Public Service.  The draft's utility as an "application of practical democracy" likely would be enhanced by the registration of females.  As recently as December 1, 2016, the Obama administration announced support for the selective service registration of women, stating, "[t]he President believes adding women to the draft would serve two purposes:  showing a commitment to gender equality throughout the armed services, and fostering a sense of public service that comes from requiring draft registration as a ritual of adulthood".[67]  Universal registration would expand emphasis on military, national, and public service by the totality of America's youth, reminding both men and women that service is a key tenet of citizenship.  As with young men, the act of registration, standing alone, would afford young American women a first, and perhaps best opportunity to act deliberately in considering and exploring the option of a military career.

Military selective service is a critical link between the AVF and society at large.  Registering *all* young people between the ages of 18 and 25 for selective service, without regard to gender, would further conjoin the interests of the American people and their military.  Universal registration would serve as a palpable reminder of the fundamental obligation, common to *all citizens*—men and women, sons and daughters, husbands and wives, brothers and sisters—to defend the country when called, and to share in the hardships of war.  One would be hard pressed to find an individual, a family, or a community without connection to a young man or woman registered for the draft.  These connections—the possibility that someone known or loved could be pressed into military service should the preservation of our national security so require, will link inextricably the American people with those who serve, now and into the future.

Military selective service is a symbol of national will and a deterrent to potential enemies of the United States.  Registering females for the first time in the Nation's history would not be expected to detract from the symbolic or deterrent effects of draft registration.  Rather, it would seem to signal to allies and potential enemies alike, an enhanced resolve to defend our nation and its partners, through the commitment and capability of the entirety of our citizenry.  It is not outside the realm of possibility, however, that nations that do not employ women in their Armed

---

[65] DoD Equities with Proposed Changes to the Selective Service System (SSS) In Support of the Deputies Small Group Meeting on Female Selective Service, July 1, 2016, p. 2.
[66] Discussion Paper, Deputies Small Group Meeting on Female Selective Service, June 29, 2016, TAB B, p. 3.
[67] Korte, Gregory and Vanden Brook, Tom, "White House: Obama supports registering women for military draft," *USA Today*, December 1, 2016.

Forces or in combat roles, could perceive the extension of the draft to women as weakening the power and lethality of the U.S. military.

### *An Additional Benefit Potentially Associated with Expanding Registration to Women*

The registration of women would provide an *additional* benefit not presently derived from the military selective service system, as follows:

The registration of women would promote fairness and equity.  That no segment of the population from ages 18 to 25 would be exempt from draft registration would ensure an equity not previously possible in the registration process and would comport the military selective service system with our Nation's touchstone values of fair and equitable treatment, and equality of opportunity.

In a tactical manifestation of the inequity inherent in the current system, men are required to register for selective service as a condition of eligibility for myriad consequential benefits and services at both the federal and state levels.  A man who forgets, delays, or fails to register is denied government employment, job training, student loans and grants, a driver's license, and a security clearance, to name but a few.[68]  Even if he has registered, government action on a man's application for benefits and services for which he is eligible often is held in abeyance while his selective service registration is verified with the SSS.  Women suffer none of these denials or delays, solely because they are not required to register for the draft, solely because they are . . . women.  That technical arguments can be applied to justify such differences in treatment is beside the point.  Men are treated differently than their female counterparts, for reasons seemingly grounded in gender; this inequity creates the perception of discrimination and unfair dealing—a tarnish that attaches to the military selective service system writ large.

A requirement for universal registration would place women and men on equal footing.  Each would be required to register; each would be required to verify registration as a prerequisite to receipt of government benefits and services; and each would be subject to the same penalties—the denial of benefits and services—for non-compliance.  Restoring the perception and *reality* of fair and equal treatment for *all* in the administration of essential federal and state programs is an additional benefit to be derived from extending to women the requirement to register for the draft.

### *Additional Resource Requirements to Register Women*

The immediate registration of all females in the 18-25 age range, the prospect of doubling the number of annual registrations and the associated compliance and verification processes, together with the potential requirement to mobilize from this larger pool, if directed, would seem likely to require an increase in SSS resourcing, as well as the revision of selective service policies and procedures to address this new population.

---

[68] A man who forgets or neglects to register until after he turns 26, past the age at which registration is required, must show, by a preponderance of the evidence, that his failure was not "knowing and willful".  The process for adjudicating the matter can be lengthy—as long as 18 months in some cases.  During this period, the man is not eligible for certain federal and state benefits and services.

Were Congress and the President to authorize the registration of women, the current cohort of about 11 million women in the primary age range of 18-25 would need to be registered in short order.  Annually thereafter, the inclusion of females would almost double the number of registrants, and the associated compliance and verification transactions.

The SSS has previously indicated that it has developed a five-year, phased implementation plan that would absorb such a significant increase in mission.  As we understand it, the SSS could initiate a drive to register women of all age cohorts, beginning paper-based registration within approximately 45 days of the enactment of directive legislation or a court order, electronic registration of the primary draft age cohorts within 12 months, and full registration, including compliance and verification cross-checks, within approximately 18 months.

We understand that the SSS has projected that it would require additional appropriations along the order of approximately $9 million in the first year of the plan, and $37 million over the first five years of execution.  If assigned the mission and provided the additional resources requested, the SSS believes that, with minor modifications, its existing infrastructure is adequate to register and draft women, as directed.[69]

To enable expanded registration, it is expected that the SSS would augment its staff with full-time equivalent civilian employees and contractors focused on increasing the capacity and throughput of its data intake, sharing, and management systems, and on reviewing and updating existing data exchange agreements and Memoranda of Understanding with federal and state agency stakeholders.[70]

Extant policies and procedures governing a future draft would require review and amendment to ensure consideration of women registrants in the execution of a fair and equitable lottery, call and deliver process, and MEPS examination and induction.  The Alternative Service Program for conscientious objectors also would require amendment, and potentially expansion, to address the female population.  And, the SSS would likely need to train and exercise its personnel and systems to ensure their readiness to execute a draft in accordance with the new policies and procedures, if directed to do so.

**Functions Currently Performed by the SSS that would be Assumed by DoD in the Absence of a National Registration Capability**

We begin our discussion in this section by recalling the Congressional declaration that the "Selective Service System should remain administratively independent of any other agency, including the Department of Defense."[71]  Maintaining the clear distinction between the DoD and the administration of the Nation's selective service registration system ensures the preeminence

---

[69] Selective Service System website, https://www.sss.gov/Registration/Women-And-Draft.
[70] Note too that federal and state laws conditioning the receipt of government benefits and services on draft registration would require deliberate assessment and possible modification to render them applicable to females. This would not be the responsibility of the SSS, but it would undoubtedly require the investment of significant time, effort, and funds on the part of federal and state stakeholders.
[71] MSSA, Section 1(f).

of civilian control and has historically been viewed as important to the public's perception of the draft process as fair and equitable.[72]  DoD believes that there is great wisdom and value in sustaining this "separation of powers".

We note first the intractable challenge that would arise were the requirement for peacetime selective service registration repealed, precluding continued update of the current registration database.  Each year hence, another birth group of men would reach age 26 and be dropped from the active database; at the same time, no new 18-year-olds would be registered.  Consequently, in only 8 years, the current registration database would contain not a single name in the primary draft pool; in the face of a national emergency, our ability to identify the set of draft-age men and execute a mass mobilization would be undone.

In responding to this question, however, DoD presumed that it would be required to assume responsibility for the registration function as it currently exists, as detailed above in this report.[73]  This report does not purport to envision how DoD might otherwise execute the registration function.  While there would be no necessity for DoD to do things exactly as they have been done in the past, the SSS experience provides the only capability currently on hand to execute the registration requirement.  In the absence of a comprehensive study beyond the scope of this report, DoD takes no position on whether the current national registration system and process could or should be modified.  We look forward to participating in a broader national dialogue on these issues, to be fostered by the work of the National Commission on Military, National, and Public Service.

That said, were the current national registration responsibilities shifted to DoD, the Department would be required to assume responsibility for both the collection and verification of the personally-identifying information of draft-age men and the sustainment of the registration database.  The express and implied tasks comprising these functions are legion, including in main:

- Implementing multi-pronged *public outreach and awareness efforts* to educate and inform young men and influencers about the importance of selective service registration and promote compliance with the legal registration requirement.
  - Supporting and leveraging the efforts of approximately 26,192 part-time uncompensated civilian volunteer registrars in high schools, at job training sites, in the Federal Bureau of Prisons and State Correction Institutions, and at National Farm-Worker Jobs locations, to generate awareness of the registration requirement and promote compliance among their constituencies.

- Assuming wholesale responsibility for the *administration and management of all means and methods of registration*:  an on-line registration-capable web-site; automatic registration via electronic data exchanges with federal and state agencies (including more than 40 state Departments of Motor Vehicles); the Interactive Voice Response system and Call Center; and the printing and mailing of paper draft

---

[72] Kamarck, *Issues for Congress*, 25.
[73] *Supra* pp. 3-5.  We believe it likely that DoD's assumption of the registration function would require significant legislative and regulatory action to modify the MSSA and its implementing regulations.

registration packets to eligible males and distribution of paper forms to U.S. Post Offices.
   o developing and sustaining interagency data exchange agreements and Memoranda of Understanding with the panoply of federal and state agencies that enable automatic registration and routinely share data with the registration database.
   o preparing and mailing approximately 2.3 million registration acknowledgment letters each year to new registrants.
   o identifying and taking appropriate action to address instances of registration non-compliance.

- Assuming responsibility for the *administration and management of one of the largest databases* of personally-identifiable information in the federal government.  This would include all Chief Information Officer and network security functions, the requirement to maintain and update information technology hardware and software applications to ensure continuous operation of the system and its relational data base, and ensuring system connectivity with authorized federal and state agency stakeholders for purposes of data exchange.
   o ensuring the accuracy and completeness of data maintained in the registration database, by cross-checking and validating information from individuals who register via electronic means, preventing fraudulent registrations, identifying deceased individuals, and correcting inaccurate personal information.
   o responding timely to requests from federal and state agencies to verify a registration, with a view to determining eligibility for benefits linked to the selective service registration requirement.

- *Responding to inquiries* from registrants, the public, Congress, and the media.

Some have proposed that the personal data needed to inform a future draft could be acquired from other federal or state government databases, augmented by the purchase of third-party commercial datasets—a "big data" model.  The current registration database relies extensively on information collected and shared by other federal and state entities, which is routinely validated and cross-checked by the SSS for accuracy and completeness.  But because each federal agency's information systems include only that data related to the persons with whom that agency engages in the conduct of its particular mission, no single agency database is likely to be complete for purposes of a draft; each list would likely exclude some draft-eligible individuals.  A cursory assessment leads to a preliminary conclusion that, at the present time, reliance on other existing government and/or commercial databases to generate a definitive list of draft-eligible youth would:  raise privacy concerns; inject uncertainties as to data quality and completeness that would bear on the fairness and equity of the draft writ large; and potentially effect the missions of participating government agencies adversely as individuals sought to avoid inclusion on the list of potential draftees.[74]

---

[74] Kamarck, *Issues for Congress*, p. 25.  Although a study of some vintage, in 1978, the Congressional Budget Office (CBO) proposed automatic registration of eligible persons by merging existing data on file with the Social Security System and Internal Revenue Service (IRS).  The CBO report suggested that such a list might miss as many as 40 percent of eligible registrants.  Further, IRS officials were concerned that such an approach would raise the level of tax evasion by those seeking to avoid draft registration.

**Systems, Manpower, and Facilities needed by DoD to Mobilize Inductees
in the Absence of the SSS**

We begin this section's discussion by reiterating the Department's stalwart belief in the value of maintaining a clear distinction between the DoD and the administration of the Nation's conscription processes.

For the first half of the 20th century, the military establishment was responsible for the operation of the national draft.  These Byzantine drafts[75] suffered from a dearth of consistency in the administration of postponements, deferments, and exemptions; the maltreatment of conscientious objectors; and lottery and quota systems racked by cronyism.  At times, the chance of being drafted varied by state, by local community, and by one's economic status, fostering near-universal perceptions of a lack of fairness and equity.[76]  The MSSA's establishment of an independent agency charged to administer the mass mobilization process was an unequivocal statement of Congress's intent to rectify these ills.  The "separation of powers" between DoD and the execution of the draft—codified in the MSSA—is essential to maintaining public trust in the fundamental fairness of the process, confidence in the system, and willingness to participate. Vesting in DoD the responsibility for mobilizing inductees has the potential to compromise the draft process, diminish the Department's effectiveness, and divert DoD senior leader attention from the grave national security challenges at hand during a mass mobilization.

Over the years, the SSS has developed a complex, yet methodical process to achieve the fair, orderly, time-phased induction of large numbers of men, with parallel tracking and processes for deferred inductions and reclassified personnel.  In responding to this question, DoD presumed that it would assume responsibility for the mobilization function as it currently exists, as detailed in this report.[77]  This report does not purport to envision how DoD might otherwise execute the mobilization function.  While there would be no necessity for DoD to do things exactly as they have been done in the past, the SSS experience provides the only model presently available for dealing with these requirements.  In the absence of a comprehensive study beyond the scope of this report, DoD takes no position on whether the current mass mobilization system and process could or should be modified.  We look forward to participating in a broader national dialogue on these issues, to be fostered by the work of the National Commission on Military, National, and Public Service.

In the absence of the SSS, DoD would need the following systems, manpower, and facilities to mobilize inductees.

*Systems*

Were DoD required to assume the mass mobilization functions presently under the auspices of the SSS, it would presumably need to inherit or replicate the capabilities of existing SSS systems, inclusive of the current public website and specialized Information Technology

---

[75] Carter, *99 Problems.*
[76] Kamarck, *Issues for Congress*, p. 8.
[77] *Infra* pp. 6-9, 23-25, 31-34.  We believe it likely that DoD's assumption of the mass mobilization function would require significant legislative and regulatory action to modify the MSSA and its implementing regulations.

systems and databases, many of which are described earlier in this report. In addition, DoD would assume responsibility for the Integrated Mobilization Information System (IMIS) to facilitate management of the more than 11,000 local board members, accession requirements, and Reserve Force Officer administration, as well as for the Central Registrant Processing Portal, which builds on IMIS as the system of record for the management of information related to the induction process.

### *Manpower*

The SSS reports that in peacetime it is manned by about 125 full-time civilian employees assigned to its national and region headquarters. In addition, 56 part-time State Directors, appointed by their State Governors, oversee selective service activities in every state, territory, and the District of Columbia. These civilians support a field structure grounded in 2,069 local boards staffed with 11,000 volunteer board members—located in almost every county of the United States and its territories. 96 District Appeal Boards and one National Appeal Board provide avenues of redress for registrants dissatisfied with decisions at the local board level.

In keeping with SSS plans, in the event of a mass mobilization, DoD would recruit, onboard, train, and sustain more than 500 Reserve Force Officers, 1,500 military retirees recalled to duty, 700 State Resource Volunteers, and 6,500 newly hired federal employees, to support the execution of a draft. Manpower augmentee assignments during a mass mobilization are projected as follows:

| | |
|---|---|
| National headquarters | 724 personnel (1 location) |
| Region headquarters | 531 personnel (3 locations) |
| State headquarters | 784 personnel (56 locations) |
| Area Offices | 4,360 personnel (436 locations) |
| Alternative Service Offices | 576 personnel (48 locations) |
| Liaisons at MEPS stations | 65 personnel |
| Reserve Force Officers | 504 personnel |
| Retiree recalls | 1,500 personnel |

Management of the Alternative Service Program would warrant special DoD attention. When properly classified by a local board in the context of a mass mobilization, conscientious objectors are required to fulfill their service obligation in a civilian capacity that contributes to the maintenance of the national health, safety, or interest. DoD would be responsible for maintaining alternative service policies and procedures, building the Alternative Service Employer Network, and interfacing with religious institutions and the conscientious objector community.[78]

### *Facilities*

DoD would assume responsibility for managing the facilities housing the SSS National headquarters and 3 Region headquarters. 56 State headquarters would be established at designated National Guard armories, and 436 Area Offices would operate from select recruiting

---

[78] 32 Code of Federal Regulations, part 1656.2.

station offices across the United States.  48 Alternative Service Offices would be co-located with designated Area Offices to administer the Alternative Service Program for conscientious objectors.

The MSSA and federal regulations[79] mandate the establishment of one or more local boards in each county or political subdivision of the United States.  Each of the 2,069 local boards presently in existence performs its official duties at sites within the jurisdiction for which it is established.  DoD would coordinate site location and support requirements through servicing Area Office personnel, assigned Reserve Force Officers, and local government authorities.

Additional facilities would be required for the 96 District Appeal Boards, the National Appeal Board, and various other supporting elements.

**Feasibility and Utility of Eliminating the Current Focus on Mass Mobilization of Primarily Combat Troops in Favor of a System that Focuses on Mobilization of Military Occupational Specialties**

The current registration requirement and systems for mass mobilization are designed to provide a fair and equitable process by which individuals are generally conscripted as "untrained manpower," without regard to their individual skills or abilities.  We will never know with certainty how an enemy might fight or precisely what demands a future conflict might place on our forces; we must guard against a presumption that future wars will be "just like the last."[80] The particular skills needed by DoD and the Military Services in the event of a national emergency will vary with the nature of the crisis.  For example:[81]

- The changing shape of future wars may require conscripting the nation's best experts at code writing, hacking, and cyber security to rapidly build a world-class cadre of cyber warriors.

- There might be an immediate need to put financial experts and market analysts into uniform to help protect the nation from potentially disruptive economic warfare.

- The military might need to mobilize social media experts who can understand and undercut the insidious messaging of highly sophisticated adversaries aiming to inflame and radicalize populations at home and abroad.

This reality prompts questions as to the feasibility and utility of targeting the draft process to specific military occupation specialties (MOSs) that may be of particular necessity or high-value in the prosecution of a given conflict, similar to recruiting practices that have been used with some success to target persons with "high-demand, low-density" skills for enlistment in the AVF.

---

[79] 32 Code of Federal Regulations, part 1605.51.
[80] Barno and Bensahel, *Mirages of War*.
[81] These examples are excerpted directly from Barno and Bensahel, *Why We Still Need the Draft*.

A targeted draft focusing on specific MOSs is feasible, but would add significant complexity to registration and mobilization processes.  More important is the understanding that applying qualitative conscription criteria to some, inevitably devolves into *de facto* exemptions for others.[82]  Significant thought and effort would need to be devoted to countering the specter of an unfair and inequitable draft raised by the use of targeted mobilization.  By segregating elements of society by intellect; skill, education or achievement in the desired discipline; or experience— the perennial question of "who serves when not all serve?" takes on a new connotation.  Those who meet the military's particular need would be conscripted to serve; those who do not would go home.  It has also been suggested that a targeted draft could prove an inefficient use of high-value labor, "indiscriminately compelling employment in the military regardless [of the fact that that even in the context of a national emergency, the] individual could have much greater value to our society elsewhere."[83]

### *Mobilization of General Combat Forces*

Under current law, the SSS will provide trained and untrained manpower to DoD in a national emergency, when directed by the President and Congress.  Although all 18-25 year old males are required to register with selective service, not all will serve.  In a mass mobilization, the Office of the Under Secretary of Defense for Personnel and Readiness would submit military manpower induction requirements through the U.S. Military Entrance Processing Command (MEPCOM) to the Director of the SSS.  The specific induction requirement would be extrapolated to identify the number of men who must be called up to achieve the desired end state, and define the timeline for processing and inducting them.  The mass mobilization system is both flexible and scalable, designed to adapt to the volume and immediacy of the requirement presented.  The MEPS receive manpower from the SSS, examine each registrant who presents to determine his physical, mental, moral, and administrative qualifications for military service, and induct qualified registrants into military service, before moving them onward to their Service military reception center for training.[84]

Past practice and current plans envision two methods for processing registrants.  Using a "one-step" process, the SSS would deliver a fixed number of registrants to each MEPS daily, in accordance with a predetermined order of call based on age cohort, lottery selection, and random sequence.  The MEPS will administer the Armed Services Vocational Aptitude Battery (ASVAB) and necessary Service-specific specialty tests, conduct a physical examination, induct qualified men into their respective Services, and provide for their immediate movement to training.  Applying the "two-step" method, the SSS would deliver a fixed number of registrants to each MEPS for aptitude testing, medical examination, and moral qualifications assessment.  Although the progression of registrants through the MEPS station mirrors the "one-step" method, at the "end of the day", registrants return home to await induction at a later date, as determined by the SSS and their respective Services.  In the interim, postponement, deferment, and

---

[82] Carter, *99 Problems*.
[83] *Id*.  *See also* Kamarck, *Issues for Congress*, p. 23.
[84] Army Regulation 601-270, OPNAVINST 1100.4C CH-2, AFI 36-2003_IP, MCO 1100.75, COMDTINST M 1100.2E Military Entrance Processing Station (MEPS)(Washington, DC: Department of Defense, September 13, 2011), p. 1.

exemption claims are adjudicated, and potential medical or conduct disqualifications are resolved.[85]

Although most of these inductees likely will be used to fill the ranks of combat units, MEPS testing is generally capable of identifying those with special skills or aptitude for a particular military occupation for which there is a need.  Those so identified *may be* trained and utilized accordingly.

### *Mobilization by Military Occupational Specialties*

"Conscription in the future could look very different than the draft calls of Korea or Vietnam".[86]  Those who would threaten our national security wear many faces; the dangers they would unleash take many forms.  Countering those bad actors and the threats they pose may require a fighting force not based solely on combat power, as was the case in the last century.  But the 21st-century, cutting edge human capital so crucial to success in a major war of the future will not likely be found in our military of today.[87]  Scrambling to identify, locate, and induct experts from scratch in the middle of a crisis mobilization would take too long, at a time when every day counts.  Thus, there is some appeal to the idea of structuring a mobilization process to target and render up those with unique skills and capabilities relevant to the crisis at hand, in other words, "drafting to need."  Secretary of Defense James Mattis signaled his interest in such an approach, when, in response to written question posed by the Senate Armed Services Committee in advance of his confirmation hearing he stated, "I will direct the Department to determine which needed skills are anticipated and pass those requirements to the Selective Service."

In its simplest form, rather than trusting to chance and presuming that each cohort of registrants that passes through a MEPS for examination and induction will possess, in the aggregate, the right mix of skills and experience that DoD needs, a targeted draft could focus on using information in the registration database to identify and cull for induction, those individuals with the knowledge, skills, and abilities associated with specific MOSs in demand.  Populating the selective service registration database, well in advance of a crisis, with information requisite to the identification of "experts" in a wide variety of disciplines, would be integral to such a plan.[88]

The registration database maintains basic information comprising a registrant "profile" on men between the ages of 18 and 26.  At initial registration, the individual could be required to report data reflecting his profession, skill certifications, conferred degrees, and licenses for inclusion in his profile.  Given the relative youth of most of the registrant population, information of this sort is likely to be scant, however.[89]  With successive periodic updates to the

---

[85] *Ibid* at p. 18.
[86] Barno and Bensahel, *Why We Still Need the Draft*.
[87] *Id.*
[88] A broad-brush approach to collecting and recording information about a wide variety of skill categories would render it more likely that the registration database would be useful for a targeted draft going forward.
[89] Currently, the only profile information routinely updated is the registrant's "current address", changes in which are required to be reported within 10 days of a move.  New address information is also collected and validated

"critical skills" section of the profile—perhaps every two to three years, continuing even after the registrant is no longer in the primary draft pool—the foundation of a targeted draft could be established and sit ready for years.  A major deficit of this method is that to maintain the functionality of the database, every American male would have to update his skills competencies with selective service on a regular basis, over most of his adult life.  Further, efforts to mandate reporting of this additional information are likely to meet with widespread objection because of perceived infringements on privacy rights and civil liberties.  Given the level of detail in the information required, the periodicity of updates, the length of the reporting period, and the likelihood of public opposition to the proposal, securing the level of compliance necessary to ensure the accuracy and completeness of the database, and enforcing penalties for non-compliance, would present significant challenges.

And, given that females are not authorized to register for the draft, there would be no mechanism by which to collect and maintain a record of their professions, skills, academic degrees, and licenses—even were use of the information intended only for voluntary recruitment purposes.  This would prove an unfortunate omission.  A targeted draft in a future war would presumptively focus on highly technical skills in short supply in the labor market as a whole.  The percent of individuals qualified in such skills is unlikely to be as variable by gender as are the combat MOSs.  Accordingly, targeting a draft to only 50 percent of the available population would severely limit success.

Considering other options, in past conflicts, state medical licensing boards arranged to provide licensing lists to the SSS as means of identifying health care providers.  Similar "partnering" arrangements could be negotiated with licensing and credentialing boards associated with other disciplines, professional organizations, academic institutions, and private industry, to share data about individuals with particular high-value skills.  For example, the American Society for Civil Engineers or the National Society of Professional Engineers could provide the SSS with information about their members specializing in the management of electric grids or the build-out of transportation infrastructures.  Microsoft and Cisco Systems could yield a cadre of trained software engineers and coders.  Adding information about these individual's specialties to their profile in the selective service registration database would allow for easy retrieval, by area of expertise, when needed by DoD in a national emergency.  Of course, any such endeavor would likely raise privacy and other civil liberties concerns.  Absent Congressional engagement, these "partnering" arrangements would rely on voluntary disclosures by boards, professional organizations, academia, and industry.  Their willingness to participate should not be presumed.  Finally, given that only males participate in the registration database, even were such information to be made available, there would be no means of recording and maintaining it for similarly expert females.  Once again, this constraint would limit the military's ability to identify the right expert, with the right skills, for use in the right place, at the right time.

Also, it is important to note that any mass mobilization process in which only those with critical skills are subject to draft will be pilloried as inequitable and unfair.  Efforts to evade would be commonplace, and—given that the information on which the draft would rely could be obtained only through voluntary disclosure—more often than not, successful.

---

through SSS data exchanges with other federal and state agencies.  The remaining information—name and social security number—is unlikely to change with the passage of years.

Taking another tack, the examination phase of the induction process could be modified to permit a more robust assessment of a registrant's skills and capabilities, earlier in the mobilization timeline.  DoD would be required to identify, in advance, the critical skills and occupations known or projected to require expert manning.  A structured interview, designed to elicit detailed information about the registrant's profession, skills, academic degrees, and licenses; a post call-up review of the registrant's selective service database profile; and consideration of the results of pinpoint aptitude tests, in addition to ASVAB scores, could identify those well suited for the high-value MOSs needed by DoD.  Those registrants would be separated from the cohort for special processing and channeled expeditiously to required training.  Although this method likely would not work with a one-step induction process, the two-step process could prove more adaptable.  The time required to conduct detailed interviews and the timing, logistics, and expense of pinpoint aptitude testing could prove challenging, however.  Nonetheless, this approach would probably be viewed as "more" fair and equitable, because an individual's identification for MOS targeting would occur only after he already had been selected for draft by regular random processes.  Given that the pool of individuals considered for channeling to special skills occupations would not include men not yet drafted and would include no women at all, the chance of identifying an individual with the particular expertise needed still would be limited.

The Health Care Professional Delivery System (HCPDS)[90] is yet another model for the induction of persons with special skills and qualifications.  HCPDS is a *standby plan* developed at the request of Congress that could be used to draft health care personnel in a crisis.[91]  No portion of the plan is intended for peacetime implementation; the plan could be implemented in connection with mass mobilization in a national emergency, but only if Congress and the President pass and sign legislation to enact it.  Further, the HCPDS plan would be activated only if the military's existing medical capability proved insufficient and there was a shortage of volunteers.  If implemented, HCPDS would provide a fair and equitable draft of medical personnel from the existing civilian pool of 3.4 million doctors, nurses, specialists, and allied health professionals in more than 60 fields of medicine.  Implementation would begin with the mass registration of both male and female[92] health care workers between the ages of 20 and 45.  The draft would call a very small percentage of these into military service.  The impact of the draft on the availability of civilian health care would be minimal; those health-care workers whose absence would seriously hurt their communities would be deferred on the basis of community essentiality.[93]  The benefits of this approach are that registration, which in itself can be controversial, takes place only after an emergency is declared and the President and Congress act affirmatively to implement the plan.  Because the ages of those required to register span a greater period of years, and females are included in the process, the pool of specialists is broader and more representative of all those with the requisite skill sets.  And, because the pool is larger,

---

[90] Throughout the Vietnam conflict, the SSS located doctors and nurses by scouring state medical licensing boards. They were offered an officer's commission and a two-year service commitment.  According to lore, some 83 of these 30,000 individuals actually refused the offer.  They were drafted anyway and put in the Army as buck privates, the military's lowest rank.

[91] In 1987, Congress enacted Public Law 100-180, codified at 50 USC Appendix, Section 460(h), ordering the SSS to prepare contingency plans for HCPDS.

[92] Female health care professionals would be included in the registration and draft unless the President or Congress directed otherwise.

[93] Selective Service System website, https://www.sss.gov/About/Medical-Draft-in-Standby-Mode.

the chance that any single individual will be selected for draft is less, and the greater the likelihood that the process will be perceived as fair and equitable. Because they are already skilled personnel, HCPDS draftees would require minimal training, allowing them to take their place in the force almost immediately. Finally, the exemption process expressly weighs the needs of the community, blunting across-the-board assertions that these professionals would be of greater benefit to national security in their civilian capacities.

Finally, a "draft" targeted at particular skills should never forswear the benefits of incentivized volunteerism. For example:[94]

- Older civilian experts in particular disciplines could be requested to pre-register (*i.e.,* if you are of a certain age and within the past 12 months you have worked in the following fields, you are encouraged to register), so that the SSS could locate them quickly in the event of an emergency. These older recruits could be permitted to serve as civilians—enabling them to serve without committing to the full rigors of military life, and their period of obligation limited to a short-term stretch of perhaps six months, renewable at the individual's election.

- Skill-targeted conscripts could be "drafted" into the Reserve Components, and authorized to split time between their uniformed and civilian jobs, leveraging skills from both.

- Specialists who volunteer could be offered an incentive package that will differentiate between classes of service. Serve at home providing healthcare, and you get some credit for doing so. Serve in the military and deploy into harm's way, and you'll earn a more generous package of educational and economic benefits.

**DoD Manpower Needs in an Emergency Requiring Mass Mobilization**

As far back as 1994, a DoD bottom-up review stated, "[w]e will never know with certainty how an enemy might fight or precisely what demands might be placed on our own forces in the future." In an uncertain world, maintaining the systems, manpower, and infrastructure required to conduct a draft will enable the country to mobilize parts or all of society, as needed to counter the catastrophe yet unenvisioned. The vast pool of human capability represented in and by the selective service registration database mitigates risk to the Nation, standing ready to be called to bridge a gap between the AVF and the force requirements of a future conflict, the demands of which we cannot predict.

A June 2012 Government Accountability Office (GAO) review recommended that the Department establish a process for "periodically reevaluating DoD's requirements for the SSS in light of changing threats, operating environments, and strategic guidance."[95] In February 2013,

---

[94] These examples are excerpted directly from Barno and Bensahel, *Why We Still Need the Draft*.
[95] U.S. Government Accountability Office, *DoD Should Reevaluate Requirements for the Selective Service System*, (Washington, DC: U.S. Government Accountability Office, June 2012), p. 16.

then-Principal Deputy Assistant Secretary of Defense for Readiness and Force Management Frederick Vollrath, responded to GAO on behalf of the Department, stating:

> "Currently the AVF is of adequate size and composition to meet the Department's demands, and the Department has no operational plans that envision mobilization at a level that would require conscription.
> . . .
>
> There would be merit in a thorough assessment of this issue, to include a review of the statutes and polices surrounding the current registration process, and the potential to include the registration of women.  This review is part of a much broader national discussion and should not be solely determined by DoD.  However, the Department stands ready to participate in such a review."[96]

In March 2014, then-Acting Under Secretary of Defense for Personnel and Readiness Jessica L. Wright, responded to questions posed by the Senate Armed Services Committee, advising, "[d]uring our 2013 Government Accountability Office audit, DoD was asked to reevaluate the mission and military requirements for the Selective Service.  We found that the changes in the world following the end of the Cold War have revised our mobilization requirements.  As such, the Department has no operational plans that envision mobilization at a level that would require conscription.  However, we contend that although there may be no immediate military necessity, there continue to be national necessities for continuation of the SSS."[97]

### Timeline

The DoD currently has no operational plans that envision mobilization at a level that would require conscription.[98]  At this time, should a national emergency so require, the Department would rely on the SSS and its current plans, policies, and procedures.  The timeline begins when Congress amends Section 17(c) of the MSSA to authorize the President to induct personnel into the Armed Forces, and the President issues follow-on directives governing the mass mobilization process.  The Office of the Under Secretary of Defense for Personnel and Readiness would submit military manpower induction requirements through MEPCOM to the Director of the SSS.  The specific induction requirement would be extrapolated to identify the number of men who must be called up to achieve the desired end state, and define the timeline for processing and inducting them.  The mass mobilization system is both flexible and scalable, designed to adapt to the volume and immediacy of the requirement presented.  Generally, as reported by the SSS, the phased timeline for mobilization would proceed as follows:

---

[96] Letter to Director, Capabilities and Management, Government Accountability Office, from Frederick E. Vollrath, Principal Deputy Assistant Secretary of Defense for Readiness and Force Management, Office of the Secretary of Defense, February 26, 2013.
[97] Acting Under Secretary of Defense for Personnel and Readiness Jessica L. Wright, "Response to SASC Question #91", March 26, 2014.
[98] Joint Staff J-5, November 17, 2016.

- *Days 1-5.* The 56 State Directors and 175 Reserve Force Officers are activated. Concurrently, the SSS Region headquarters are expanded and the State headquarters are established.

- *Days 6-45.* The national draft lottery is conducted. An additional 329 Reserve Force Officers and 1,500 retired National Guard members are recalled to active duty to support Area Offices. The SSS receives authority for the expedited hire of more than 6,500 full-time employees. In communities across the country, more than 11,000 local board members are notified to report for duty.

- *Days 46-85.* The 436 Area Offices and 48 Alternative Service Offices are established and operational. Initial and refresher training for local board members and new civilian employee hires is completed.
  - The first 100,000 or more registrants receive a notice to report to the MEPS for examination. Notice is mailed to the most recent address for the registrant as recorded in the registration database.

- *Days 85-100.* The first local board meeting takes place. The 96 District Appeal Boards, consisting of 480 members, and the National Appeal Board, consisting of three or more Presidential appointees and 10 full-time employees, are activated.
  - Area Offices receive their first claims for postponement, deferral, or exemption.

- *Days 101-150.* The first meetings of the District Appeal Boards and the National Appeal Board take place.

- *Day 183.* The first induction notifications are mailed.

- *Day 193.* The first inductees report to the MEPS for transport to their Service military reception center.

- *Day 210.* The first 100,000 inductees report for service.

- *Day 222.* The first medical personnel report for service.

*Figure 2* depicts the notional SSS mobilization timeline in graphic form.

**Figure 2: *Notional SSS Mobilization Timeline***



The Alternative Service Program is activated on a similar timeline. An individual granted conscientious objector status would be processed and enrolled for employment through the Alternative Service Employment Network at generally the same rate as an inductee is processed for entry into military service.

The information above reflects the notional timeline established by the SSS. We note, however, the findings of a 2012 GAO review, advising that "[a]ccording to official spokespersons for the SSS, the agency is not currently resourced to meet DoD's requirement for

it to deliver the first inductees in 193 days and 100,000 inductees in 210 days, without jeopardizing the fairness and equity of the draft." [99]

### Additional Critical Skills Needed

The DoD currently has no operational plans that envision mobilization at a level that would require conscription.[100]  At present, the only plan for a separate registration and mobilization process targeting critical skills focuses on health care personnel.[101]  We will never know with certainty how an enemy might fight or precisely what demands might be placed on our own forces in the future.  Other critical skills needed in the event of a national emergency will depend on the threat we face, but certainly *could* extend to cyber specialists, drone operators, technical and scientific experts, and linguists.  Other more prosaic skills:  expertise in rapid road and rail logistics, fuel distribution and water purification, and policing and physical security, also *could* be deemed critical, depending on the nature of the conflict, the mission, environment, and other factors.

## Assumptions Used by the Department

- For the purpose of this report, the term "mass mobilization" refers to the activation of conscription or a military draft.

- Mass mobilization will be properly authorized by law and Presidential directive. Legal authorities will be available to support mobilization processes.  Adequate funding and manpower will be available to execute the induction of untrained manpower (general registrants) and/or the registration and induction of health care personnel.

- The entry processing capability of MEPCOM is 18,000 registrants per day, presuming adequate augmentation of manpower and facilities.  Accessions will be inducted or enlisted/appointed and transported to designated Service training centers/duty stations identified by the Office of the Secretary of Defense or the appropriate Service.

- The SSS will adjust its master data file to remove from the list of eligible draftees those individuals reported by MEPCOM as already having been accessed by a Military Service.  The Defense Manpower Data Center (DMDC) will report to the SSS the names of personnel with less than 1 year of service who have been discharged or transferred to a Reserve Component for the convenience of the government.  DMDC's report will include the length of each individual's service and characterization of discharge.

---

[99] U.S. Government Accountability Office, *DoD Should Reevaluate Requirements for the Selective Service System*, (Washington, DC: U.S. Government Accountability Office, June 2012), p. 7.
[100] Joint Staff J-5, November 17, 2016.
[101] *Supra* p. 29.

- Conduct of the credentialing process for health care personnel, including the review and validation of professional licenses, diplomas, training certificates, and related materials, is the responsibility of the individual Military Service. The Services will provide qualified representatives at each MEPS to credential and determine the appropriate military pay grade of each health care professional prior to induction or commission.

- Lead-time permitting, the SSS will first use a two-step examination and induction process for both general and health care registrants, with only those deemed qualified for military service subsequently ordered for induction. Given insufficient lead-time, however, SSS would employ the one-step examination and induction process, then shift to a two-step process, as time and the number of inductees permit. Both large and small volume deliveries of registrants to DoD for induction processing can be managed under either process.

**Conclusion**

Throughout most of the 20th century, the laws of the United States have obligated male citizens and residents to register for a draft administered by an agency of the federal government. The DoD currently has no operational plans that envision mobilization at a level that would require conscription. Even in the face of sustained conflicts in Iraq and Afghanistan, DoD has maintained its ability to recruit and retain a professional volunteer force without resorting to a draft. Nonetheless, the potential for global conflict on the scale of another world war still exists. Every Administration since 1980 has made the conscious decision to maintain national registration for selective service as the tool through which Congress and the President would provide additional manpower to the Armed Forces—an "insurance policy"—should future threats spark requirements for forces in excess of those available to the AVF.

The SSS is an independent federal agency within the executive branch, headquartered in Arlington, Virginia. Since 1973, the MSSA has designated the SSS as an "active standby" organization, with the mission to: maintain a complete registration and classification structure capable of immediate operation in the event of a national emergency (including a structure for the registration and classification of persons qualified for employment in a health care occupation essential to the maintenance of the Armed Forces); and maintain personnel adequate to reconstitute immediately the full operations of the mass mobilization system, including trained volunteers, military reservists and military retirees.

A number of benefits derive, both directly and indirectly, from the military selective service system. Primarily, selective service guarantees the certain and timely fulfillment of military manpower requirements in a national emergency. Also of significance, the selective service registration database provides valuable military recruiting leads. In a more indirect vein, registration reminds America's youth of the importance of Military, National, and Public Service and the existence of a draft serves as a critical link between the AVF and society at large. Finally, military selective service is both a symbol of our national will and a deterrent to potential enemies of the United States.

Under current law, women may serve voluntarily in the U.S. Armed Forces but are not, and never have been, required to register for selective service. Since the ban on women in combat was lifted, the merits of including women in the requirement to register for the draft have been hotly debated in the media and in the halls of Congress. It appears that, for the most part, expanding registration for the draft to include women would enhance further the benefits presently associated with the selective service system. Opening registration to *all* members of the population aged 18-25—regardless of gender—would convey the added benefit of promoting fairness and equity not previously possible in the process and would comport the military selective service system with our nation's touchstone values of fair and equitable treatment, and equality of opportunity.

Maintaining the clear distinction between the DoD and the administration of the Nation's selective service system ensures the preeminence of civilian control and has historically been viewed as important to the public's perception of the draft process as fair and equitable. DoD believes that there is great wisdom and value in sustaining this "separation of powers." This report does not purport to envision how DoD might otherwise execute the registration and mass mobilization functions. In the absence of a comprehensive study and a broader national dialogue on the issues, DoD takes no position on whether the current national registration system and mobilization process could or should be modified.

The current registration requirement and systems for mass mobilization are designed to provide a fair and equitable process by which individuals are generally conscripted as "untrained manpower," without regard to their individual skills or abilities. We will never know with certainty how an enemy might fight or precisely what demands a future conflict might place on our forces. The particular skills needed by DoD and the Military Services in the event of a national emergency will vary with the nature of the crisis. A targeted draft focusing on specific MOSs is feasible, but would add significant complexity to registration and mobilization processes. Significant thought and effort would need to be devoted to countering the specter of an unfair and inequitable draft raised by the use of targeted mobilization.

One option might be that at initial registration, the individual could be required to report data reflecting his profession, skill certifications, conferred degrees, and licenses for inclusion in his selective service profile. With successive periodic updates to the "critical skills" section of the profile—perhaps every two to three years, continuing even after the registrant is no longer in the primary draft pool—the foundation of a targeted draft could be established and sit ready for years. "Partnering" arrangements could be negotiated with licensing and credentialing boards associated with other disciplines, professional organizations, academic institutions, and private industry, to share data about individuals with particular high-value skills.

Taking yet another tack, the examination phase of the induction process could be modified to permit a more robust assessment of a registrant's skills and capabilities, earlier in the mobilization timeline. Those registrants identified through structured interviews and aptitude testing as possessing special skills would be separated from their MEPS cohort for special processing and channeled expeditiously to required training. This approach would probably be viewed as "more" fair and equitable, because an individual's identification for MOS targeting would occur only after he already had been selected for draft by regular random processes.

36

HCPDS is yet another model for the induction of persons with special skills and qualifications.  HCPDS is a *standby plan* developed at the request of Congress that could be used to draft health care personnel in a crisis.  Finally, a "draft" targeted at particular skills should never forswear the benefits of incentivized volunteerism.

Given that females are not authorized to register for the draft, there would be no mechanism by which to collect and maintain a record of their professions, skills, academic degrees, and licenses—even were use of the information intended only for voluntary recruitment purposes.  This would prove an unfortunate omission.  A targeted draft in a future war would presumptively focus on highly technical skills in short supply in the labor market as a whole.  The percent of individuals qualified in such skills is unlikely to be as variable by gender as are the combat MOSs.  Accordingly, targeting a draft to 50 percent of the available population— males only—would severely constrain success.

A June 2012 GAO review recommended that the Department establish a process for "periodically reevaluating DoD's requirements for the SSS in light of changing threats, operating environments, and strategic guidance."  The Department has consistently responded to such recommendations by advising that the AVF is currently of adequate size and composition to meet the Department's demands, and that we have no operational plans that envision mobilization at a level that would require conscription.  At the same time, the Department acknowledges the merit of a thorough assessment of this issue, to include a review of the statutes and polices surrounding the current registration process, and the potential to include the registration of women.  Any such review should be part of a much broader national discussion and should not be solely determined by DoD.

Finally, at this time, should a national emergency so require, the Department would rely on the SSS and its current plans, policies, and procedures to execute a mass mobilization.