UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

NATIONAL COALITION FOR MEN, *et al.*, §
§
    *Plaintiffs*, §
§
v. § CIVIL ACTION H-16-3362
§
SELECTIVE SERVICE SYSTEM, *et al.*, §
§
    *Defendants*. §

**MEMORANDUM OPINION AND ORDER**

Pending before the court is: (1) a motion for summary judgment filed by plaintiffs National Coalition for Men ("NCFM"), Anthony Davis, and James Lesmeister ("Plaintiffs") (Dkt. 73); and (2) a cross-motion for summary judgment and motion to stay filed by defendants Selective Service System ("SSS") and Lawrence Romo (collectively, "Defendants") (Dkt. 80). Plaintiffs responded to Defendants' cross-motion. Dkt. 81. Having considered the motions, response, evidence in the record, and applicable law, the court is of the opinion that Plaintiffs' motion for summary judgment (Dkt. 73) should be GRANTED and Defendants' motion for stay and summary judgment (Dkt. 80) should be DENIED.

**I. BACKGROUND**

This case balances on the tension between the constitutionally enshrined power of Congress to raise armies and the constitutional mandate that no person be denied the equal protection of the laws. U.S. Const. art. I, § 8; U.S. Const. amend. V; *Bolling v. Sharpe*, 347 U.S. 497, 74 S. Ct. 693 (1954).

The Military Selective Service Act ("MSSA") requires males—but not females—to register for the draft. The MSSA provides that "every male citizen of the United States, and every other male

person residing in the United States . . . between the ages of eighteen and twenty-six," must register with SSS. 50 U.S.C. § 3802(a). After registering, men have a continuing obligation to update SSS with any changes in their address or status. § 3813. Failure to comply with the MSSA can result in up to $10,000 in fines and five years of imprisonment. § 3811(a). Males are also subject to other penalties for failing to register, including denial of federal student loans. § 3811(f).

Plaintiffs challenge the MSSA on equal protection grounds, arguing that the MSSA's male-only registration requirement violates the Fifth Amendment Due Process Clause. Dkt. 60 at 12. Plaintiffs Lesmeister and Davis are males subject to the draft requirements.[1] Dkt. 73-2 at 1–2. Both have registered with the SSS, in compliance with the MSSA. *Id.* NCFM is a non-profit, 501(c)(3) educational and civil rights corporation. *Id.* at 3. Some of NCFM's members, including Davis, are males subject to the draft requirements who have already registered or will have to register under the MSSA. *Id.* at 3–4.

In 2013, NCFM and Lesmeister filed suit against Defendants in the Central District of California. Dkt. 1. Initially, Judge Dale S. Fischer, the Central District of California judge, dismissed the case as not ripe for review. Dkt. 20. The Ninth Circuit reversed and remanded, holding that the plaintiffs' claims were "definite and concrete, not hypothetical or abstract, and so ripe for adjudication." *Nat'l Coal. for Men v. Selective Serv. Sys.*, 640 F. App'x 664, 665 (9th Cir. 2016) (citations and quotations omitted). On remand, Judge Fischer granted Defendants' motion to dismiss NCFM without prejudice because the organization lacked associational standing. Dkt. 44 at 4. Further, the court determined that venue was not proper in the Central District of California and transferred the case to the Southern District of Texas, where Lesmeister resides. *Id.* at 5.

---

[1] Plaintiffs request judicial notice of certain facts in this case. Dkt. 73-2. To the extent Plaintiffs request judicial notice of facts that are not in dispute, the court grants this request.

Upon transfer, Lesmeister amended his complaint to name NCFM and Davis as plaintiffs. Dkt. 60. This court subsequently determined that all three plaintiffs have standing. Dkt. 59. Both Plaintiffs and Defendants now move for summary judgment, arguing that current equal protection jurisprudence entitles them to judgment as a matter of law.[2]

## II. ANALYSIS

**A.    Motion to Stay**

"The proponent of a stay bears the burden of establishing its need." *Clinton v. Jones*, 520 U.S. 681, 708, 117 S. Ct. 1636 (1997). In their pending motion, Defendants first contend that the court should stay the current proceedings. Dkt. 80 at 15–21. Defendants argue that the case is not ripe for review because Congress is currently considering whether to add women to the draft. *Id.* Defendants also argue that, under separation-of-power principles, the court should postpone resolution of the case during congressional debate on the issue. *Id.* Finally, Defendants urge the court to stay the case using its inherent case-management power because the balance of hardships weighs in Defendants' favor. *Id.*

   **1.    Ripeness**

The justiciability doctrine of ripeness prevents courts, "through avoidance of premature adjudication, from entangling themselves in abstract agreements." *Choice Inc. of Tex. v. Greenstein*, 691 F.3d 710, 715 (5th Cir. 2012) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149, 87 S. Ct. 1507 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977)). A court must dismiss for lack of ripeness when the case is "abstract or hypothetical." *Id.* (quoting *New*

---

[2]A court shall grant summary judgment when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Here, both sides have moved for summary judgment, so the parties agree that there are no material fact issues to resolve. Dkt. 73; Dkt. 80.

*Orleans Pub. Serv., Inc. v. Council of New Orleans*, 833 F.2d 583, 586 (5th Cir. 1987)). "Ripeness 'requir[es] us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Texas v. United States*, 523 U.S. 296, 300–01, 118 S. Ct. 1257 (1998) (quoting *Abbott Labs.*, 387 U.S. at 149). "A case is generally ripe if any remaining questions are purely legal ones; conversely, a case is not ripe if further factual development is required." *Choice Inc. of Tex.*, 691 F.3d at 715 (quoting *New Orleans Pub. Serv., Inc.*, 833 F.2d at 586).

Defendants argue that the case is not currently fit for judicial decision because Congress recently established the National Commission on Military, National, and Public Service ("the Commission") to consider whether Congress should modify or abolish the current draft registration requirements. Dkt. 80 at 17; National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, § 551, 130 Stat. 2000, 2130 (2016). Although the Ninth Circuit previously held that the case was ripe despite ongoing congressional debate, Defendants contend that the recently created Commission now renders Plaintiffs' claims unripe. *Id.* at 19. Defendants request that the court stay proceedings until the Commission has issued its report and Congress has had the opportunity to act on the Commission's recommendations. *Id.* at 21.

However, the existence of the Commission does not affect the ripeness of Plaintiffs' claims. The question of whether the MSSA violates the Constitution is purely legal; no further factual development is necessary for the court to decide the issue. Plaintiffs' claims are not "abstract or hypothetical." *Choice Inc. of Tex.*, 691 F.3d at 715 (quoting *New Orleans Pub. Serv., Inc.*, 833 F.2d at 586)). While the Commission's recommendations could affect the current proceedings, the Commission is not set to release its final report until 2020. Dkt. 86-1 at 4 (Commission interim report). There is no guarantee that the Commission will recommend amending or abolishing the

4

MSSA—and, even if it does, Congress is not required to act on those recommendations. Congress has been debating the male-only registration requirement since at least 1980 and has recently considered and rejected a proposal to include women in the draft. *Rostker*, 453 U.S. at 60; Dkt. 80-3 at 11 (Letter to Armed Services Committee Chairs, Sept. 2016). It is Defendants' arguments—not Plaintiffs' claims—that are too hypothetical for the court's consideration.[3]

"However, even where an issue presents purely legal questions, the plaintiff must show some hardship in order to establish ripeness." *Choice Inc. of Tex.*, 691 F.3d at 715 (citing *Cent. & S. W. Servs., Inc. v. EPA*, 220 F.3d 683, 690 (5th Cir. 2000)) (quotations omitted). Here, Plaintiffs have demonstrated that they are subject to the MSSA. Dkt. 73-2. NCFM's members include individuals who will have to register under the MSSA in the future and will be subject to ongoing requirements to update their personal information. *Id.* Moreover, "discrimination itself, by perpetuating 'archaic and stereotypic notions' . . . can cause serious non-economic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group." *Heckler v. Mathews*, 465 U.S. 728, 739–40, 104 S. Ct. 1387 (1984) (citations omitted). Thus, Plaintiffs have shown "some hardship" and the case is ripe.

### 2. Separation of Powers

Second, Defendants effectively argue that the court *must* grant a stay to give Congress proper deference in the realm of military affairs and avoid violating the separation of powers. Dkt. 80 at 11–13. Defendants cite Congress's broad constitutional power to conduct military affairs and the Supreme Court's decision in *Rostker v. Goldberg*, 453 U.S. 57, 101 S. Ct. 2646 (1981). Dkt. 80 at

---

[3]Defendants also argue that deference to Congress is appropriate when pending legislation may render a legal challenge moot, and that such deference applies here. Dkt. 80 at 19–20 (citing *Schlesinger v. Ballard*, 419 U.S. 498, 510 n.13, 95 S. Ct. 572 (1975)). However, Defendants do not cite any pending legislation that would add women to the draft.

5

17–19. However, "separation of powers does not mean that the branches 'ought to have no *partial agency* in, or no *controul* over the acts of each other.'" *Clinton*, 520 U.S. at 703 (quoting The Federalist No. 47, at 325–326 (James Madison) (J. Cooke ed., 1961) (emphasis in original)). Even judicial review that "significantly burden[s] the time and attention" of another branch "is not sufficient to establish a violation of the Constitution." *Id.* The Supreme Court has repeatedly affirmed that "concerns of national security . . . do not warrant abdication of the judicial role." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010).

*Rostker* itself expressly acknowledged that Congress does not receive "blind deference in the area of military affairs." 453 U.S. at 67. Even though congressional power in this area is "broad and sweeping," Congress may not "exceed[] constitutional limitations on its power in enacting such legislation." *Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47, 58, 126 S. Ct. 1297 (2006) (citations and quotations omitted). As this court previously reasoned:

> The court agrees with Defendants that Congress has broad power to raise and regulate armies and navies. *Rostker*, 453 U.S. at 65. Thus, "a healthy deference to legislative and executive judgments in the area of military affairs" should be given by the court. *Id.* at 66. *Rostker* thoroughly explained the reason to provide deference to Congress when dealing with military affairs. *See id.* at 64–67. But "[n]one of this is to say that Congress is free to disregard the Constitution when it acts in the area of military affairs. In that area, as any other, Congress remains subject to the limitations of the Due Process Clause." *Id.* at 67.

Dkt. 66 at 6–7 (denying Defendants' motion to dismiss for failure to state a claim). *Rostker* explicitly requires Congress to comply with the Constitution in the area of military affairs, and Plaintiffs allege that the MSSA violates the Constitution. *Rostker*, 453 U.S. at 67; Dkt. 60 at 12. Additionally, as noted above, Congress has been debating the MSSA's registration requirement for decades with no definite end in sight. Even constitutionally mandated deference does not justify a

6

complete and indefinite stay when parties allege that the federal government is presently violating their constitutional rights.

### 3. Inherent Power

Finally, Defendants request that the court exercise its discretion to stay the case. This court "has broad discretion to stay proceedings as an incident to its power to control its own docket." *Clinton*, 520 U.S. at 706. Even if the burdens on the government do not violate separation-of-powers principles, "those burdens are appropriate matters for the District Court to evaluate in its management of the case." *Id.* at 707. "[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Qualls v. EOG Res., Inc.*, No. H-18-666, 2018 WL 2317718, at *2 (S.D. Tex. May 22, 2018) (Miller, J.) (alteration in original) (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254, 57 S. Ct. 163 (1936)). The movant must "make out a clear case of hardship or inequity in being required to go forward." *Landis*, 299 U.S. at 254.

Defendants contend that a court ruling at this time "could disrupt or distract a process that may ultimately render [the issue] moot" if the Commission recommends "ending registration in its entirety." Dkt. 80 at 18; *see also* Dkt. 80 at 21 ("Alternatively, such a ruling could require the Government to spend millions of dollars and expend significant resources and effort changing the system of selective service—a considerable hardship—when Congress may wish to change the system in a completely different manner following the Commission's review."). However, if the court stayed the case until Congress acted on the Commission's recommendations, the case could be stayed indefinitely. The Commission is under no obligation to recommend certain outcomes to Congress, and Congress is under no obligation to follow or act on those recommendations. The fact

and nature of future congressional action is highly speculative. Thus, the court's time and effort is likely best spent on the case at this stage, rather than at some indefinite time in the future.

Moreover, present resolution of the case will not create such a hardship for Defendants that the hardship justifies a continuous and indefinite violation of Plaintiffs' constitutional rights. Congressional resolution of this issue, if it occurs, will not necessarily be less burdensome for Defendants than judicial resolution. Defendants have not made out a "clear case of hardship or inequity." *Landis*, 299 U.S. at 254. Therefore, the court declines to use its inherent authority to stay the case.

**B.** *Rostker v. Goldberg* **and Changing Opportunities for Women in the Military**

On substance, Defendants first argue that the Supreme Court's holding in *Rostker v. Goldberg*, 453 U.S. 57, 101 S. Ct. 57 (1981), forecloses any challenge to gender discrimination in the MSSA. Dkt. 80 at 21–22. However, as this court previously held in denying Defendants' motion to dismiss, *Rostker* is factually distinguishable from the current case. Dkt. 66 (order denying Defendants' motion to dismiss for failure to state a claim). The court again declines to resolve the case on *Rostker* alone.

**1.** **The *Rostker* Opinion**

In *Rostker*, the Supreme Court squarely addressed the question of whether the male-only registration requirement in the MSSA violated equal protection principles. 453 U.S. at 83. The Court first noted that judging the constitutionality of a statute passed by Congress is "the gravest and most delicate duty that this Court is called upon to perform." *Id.* at 64 (quoting *Blodgett v. Holden*, 275 U.S. 142, 148, 48 S. Ct. 105 (1927)). Further, the case arose "in the context of Congress' authority over national defense and military affairs, and perhaps in no other area has the Court

8

accorded Congress greater deference." *Id.* at 64–65. Thus, the *Rostker* Court emphasized that it owed great deference to Congress's judgment in passing the MSSA because "the Constitution itself requires such deference to congressional choice." *Id.* at 67.

The Court held that the MSSA was constitutional. *Id.* at 83. After considering the extensive legislative history of the MSSA, the Court concluded that "the decision to exempt women from registration was not the accidental by-product of a traditional way of thinking about females." *Id.* at 74 (quotations omitted). Instead, the Court acknowledged that women were not eligible for combat, but that the purpose of registration was to prepare for a draft of combat troops. *Id.* at 76–77. The Court reasoned:

> This is not a case of Congress arbitrarily choosing to burden one of two similarly situated groups, such as would be the case with an all-black or all-white, or an all-Catholic or all-Lutheran, or an all-Republican or all-Democratic registration. Men and women, because of the combat restrictions on women, are simply not similarly situated for purposes of a draft or registration for a draft. Congress' decision to authorize the registration of only men, therefore, does not violate the Due Process Clause.

*Id.* at 78–79. Thus, the Court concluded that women's ineligibility for combat "fully justifie[d]" the MSSA's male-only registration requirement. *Id.* at 79. "The Constitution requires that Congress treat similarly situated persons similarly, not that it engage in gestures of superficial equality." *Id.* Because men and women were not similarly situated with respect to combat eligibility, and therefore not similarly situated with respect to the draft, the Court held that the MSSA did not violate equal protection principles. *Id.*

2. **Factual Developments Since *Rostker***

In the nearly four decades since *Rostker*, however, women's opportunities in the military have expanded dramatically. In 2013, the Department of Defense officially lifted the ban on women

9

in combat. Dkt. 73-1 at 9. In 2015, the Department of Defense lifted all gender-based restrictions on military service. Dkt. 73-1 at 12. Thus, women are now eligible for all military service roles, including combat positions.

Therefore, although "'judicial deference . . . is at its apogee' when Congress legislates under its authority to raise and support armies," *Rumsfeld*, 547 U.S. at 58 (quoting *Rostker*, 453 U.S. at 70), the *Rostker* holding does not directly control here. The dispositive fact in *Rostker*—that women were ineligible for combat—can no longer justify the MSSA's gender-based discrimination.[4] "[A] legislative act contrary to the constitution is not law," and it is the "province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 1 Cranch 137, 177, 5 U.S. 137 (1803). The court will consider the constitutionality of the MSSA anew.

### C. The MSSA and Equal Protection

#### 1. Standard of Review

Laws differentiating on the basis of gender "attract heightened review under the Constitution's equal protection guarantee." *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1689 (2017) (citing *Califano v. Westcott*, 443 U.S. 76, 84, 99 S. Ct. 2655 (1979)). Typically, "[t]he defender of legislation that differentiates on the basis of gender must show 'at least that the [challenged] classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives.'" *Id.* at 1690

---

[4] Defendants argue that under *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484, 109 S. Ct. 1917 (1989), this court is bound by Supreme Court precedent regardless of a change in factual circumstances. Dkt. 80 at 21–22. However, *Rodriguez de Quijas* merely notes that, in the face of two legally conflicting decisions, lower courts should follow the decision most directly on point instead of attempting to overrule one of the conflicting decisions. 490 U.S. at 484. Despite *Rostker*'s undeniable relevance to this case, the *Rostker* holding is not directly on point and therefore does not mandate judgment in Defendants' favor.

(quoting *United States v. Virginia*, 518 U.S. 515, 533, 116 S. Ct. 2264 (1996)). Further, "the classification must substantially serve an important governmental interest *today*"—it is insufficient that the law served an important interest in the past. *Id.* (citing *Obergefell v. Hodges*, 135 S. Ct. 2584, 2603 (2015)) (emphasis in original).

Although the MSSA discriminates on the basis of gender, Defendants argue that a lower, rational-basis-like standard of review applies. Defendants contend that "the Court's departures—in *Rostker* and other military cases—from core aspects of strict or intermediate scrutiny demonstrates that its approach most closely resembles rational-basis review." Dkt. 80 at 23. Defendants emphasize the *Rostker* Court's highly deferential approach to reviewing the MSSA and argue that recent precedent, including *Trump v. Hawaii*, 138 S. Ct. 2392 (2018), affirms this lower standard of review in the military context. *Id.* at 24.

However, Defendants' reliance on *Trump* is misplaced. The *Trump* decision concerned judicial review of the President's power over immigration. 138 S. Ct. at 2420. While the *Trump* Court acknowledged that a deferential standard of review applied "across different contexts and constitutional claims," the Court's entire discussion centered on different claims within the realm of immigration law. *Id.* at 2419. Certainly, there are significant similarities between the Court's deference to Congress in military affairs and its deference to the President in immigration affairs. However, the *Trump* decision is tangential, at best, to the issue currently before the court.

Instead, *Rostker* itself provides the applicable standard of review when Congress exercises its constitutional power to raise and support armed forces. In *Rostker*, as here, the government expressly argued that the Court should "only [] determine if the distinction drawn between men and women bears a rational relation to some legitimate Government purpose." 453 U.S. at 69. However, the Court expressly declined to adopt this position. *Id.* at 69–70. Rather, the Court relied on

11

*Schlesinger v. Ballard*, 419 U.S. 498, 95 S. Ct. 572 (1975), in which the Court upheld naval regulations creating different promotion requirements for female officers. *Rostker*, 453 U.S. at 71. As the Court explained, "[*Schlesinger*] did not purport to apply a different equal protection test because of the military context, but did stress the deference due congressional choices among alternatives in exercising the congressional authority to raise and support armies and make rules for their governance." *Id.* at 71.

The Court emphasized that the judiciary *"*cannot ignore Congress' broad authority conferred by the Constitution to raise and support armies when we are urged to declare unconstitutional its studied choice of one alternative in preference to another for furthering that goal.*"* *Id*. at 71–72. However, the Court went on to reason that "the Government's interest in raising and supporting armies is an 'important governmental interest,'" and that "[t]he exemption of women from registration is . . . closely related to Congress' purpose in authorizing registration." *Id.* at 70, 79 (quoting *Craig v. Boren*, 429 U.S. 190, 97 S. Ct. 451 (1976)). The *Rostker* Court therefore subjected the MSSA to a heightened level of scrutiny, even in light of the Court's marked deference to Congress's "studied choice" between alternatives. *Id.* at 72.

2. **Analysis**

Thus, the dispositive question here is whether the MSSA both serves important governmental objectives and is substantially related to the achievement of those objectives. *Morales-Santana*, 137 S. Ct. at 1689. First, "[n]o one could deny" that the governmental objective of raising and supporting armies is an "important governmental interest." *Rostker*, 453 U.S. at 70. However, Plaintiffs initially counter that registration, and the draft itself, will not necessarily be used to draft combat troops in future wars. Dkt. 73 at 20–21. Plaintiffs contend that the court should analyze the

MSSA with the understanding that registrants may be drafted into both combat and non-combat roles, and that Congress's important objective should be understood in that light. *Id.*

However, while future wars may require a draft of non-combat troops, Congress still understands the draft, as it currently exists, to be for the "mass mobilization of primarily combat troops." National Defense Authorization Act, Pub. L. No. 114-328, § 552(b)(4), 130 Stat. at 2131. This determination is well within Congress's constitutional role of governing and maintaining effective armed forces. *See Rostker*, 453 U.S. at 68. The court's inquiry is thus restricted to whether the MSSA's male-only registration requirement is substantially related to Congress's important objective of drafting and raising combat troops.

Next, Defendants must show that the MSSA's male-only registration requirement is "substantially related" to Congress's objective. *See Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724, 102 S. Ct. 3331 (1982). "The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation. And it must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." *Virginia*, 518 U.S. at 533; *see also Rostker*, 453 U.S. at 67 (noting that the Court previously struck down gender-based classifications that were based on "overbroad generalizations"). "[I]f the statutory objective is to exclude or 'protect' members of one gender because they are presumed to suffer from an inherent handicap or to be innately inferior, the objective itself is illegitimate." *Mississippi Univ. for Women*, 458 U.S. at 724 (citing *Frontiero v. Richardson*, 411 U.S. 677, 691, 93 S. Ct. 1764 (1973) (plurality opinion)).

Defendants offer two potential justifications for male-only registration.[5] First, Defendants argue that female eligibility to serve in combat roles "does not answer the question of whether women should be *conscripted* into combat roles" because conscription could lead to "potential tradeoffs" for the military. Dkt. 80 at 27 (emphasis added). Construed liberally, Defendants appear to be arguing that requiring women to register for the draft would affect female enlistment by increasing the perception that women will be forced to serve in combat roles. *Id.* at 28; Dkt. 80-3 at 173.

However, this argument smacks of "archaic and overbroad generalizations" about women's preferences. *Schlesinger*, 419 U.S. at 507–08; *see also Virginia*, 518 U.S. at 533; *Rostker*, 453 U.S. at 67. At its core, Defendants' argument rests on the assumption that women are significantly more combat-averse than men. Defendants do not present any evidence to support their claim or otherwise demonstrate that this assumption is anything other than an "ancient canard[] about the proper role of women." *Rostker*, 453 U.S. at 86 (Marshall, J., dissenting) (quotations and citations omitted). As the Court reasoned in *Schlesinger*:

---

[5]In 2016, a Senate-passed version of the National Defense Authorization Act ("NDAA") would have required women to register for the draft. Dkt. 80-3 at 11 (Letter to Armed Services Committee Chairs, Sept. 2016). The Senate Armed Services Committee acknowledged that "the ban of females serving in ground combat units has been lifted by the Department of Defense, and as such, there is no further justification to apply the selective service act to males only." S. Rep. No. 114-255, at 150–51 (2016). However, opposition to this change remained, and the final version of the NDAA instead created the Commission to explore a number of draft-related topics. National Defense Authorization Act, Pub. L. No. 114-328, § 552, 130 Stat. at 2131; *see* Dkt. 80-3 at 11 (Letter to Armed Services Committee Chairs). However, based on record before the court, Congress generated very little documentation on why it ultimately declined to amend the MSSA. Defendants only offer a 2016 letter from a group of senators formally requesting that the House remove the provision adding women to the draft. Dkt. 80-3 at 11 (Letter to Armed Services Committee Chairs) ("We should not hinder the brave men and women of our armed forces by entrapping them in unnecessary cultural issues . . . The provision of the FY17 NDAA requiring women to register for the Selective Service should be removed."). Defendants do not offer concerns about "unnecessary cultural issues" as a justification for the MSSA's continued discrimination. Thus, the court must primarily rely on congressional records from previous debates on the MSSA.

> In both *Reed* and *Frontiero*[,] the challenged classifications based on sex were premised on overbroad generalizations . . . that men would generally be better estate administrators than women . . . [and] that female spouses of servicemen would normally be dependent on their husbands, while male spouses of servicewomen would not. In contrast, the different treatment of men and women naval officers . . . reflects, not archaic and overbroad generalizations, but, instead, the demonstrable fact that male and female line officers in the Navy are not similarly situated with respect to opportunities for professional service.

419 U.S. at 507–08. It is not a "demonstrable fact" that fewer women will enlist for fear of being conscripted into combat. This justification fails.

Moreover, this justification appears to have been created for litigation. *See Virginia*, 518 U.S. at 533. Defendants have not produced any evidence that Congress actually looked to this concern in declining to add women to the draft. Defendants' evidence establishes only that Congress may have considered a similar issue in evaluating the Department of Defense's decision to open combat positions to women. *See* Dkt. 80-3 at 171–74. Thus, although the court must give significant deference to Congress's judgment in military affairs, such deference is not implicated here.

Second, Defendants argue that Congress preserved the male-only registration requirement out of concern for the administrative burden of registering and drafting women for combat. Dkt. 80 at 28. Unlike Defendants' first offered justification, Congress considered this issue extensively in debates over the MSSA. *See* S. Rep. No. 96-826, at 156–61 (1980); *Rostker*, 453 U.S. at 81. Thus, the court's deference to Congress's "studied choice" is potentially at its height. *Rostker*, 453 U.S. at 72.

Typically, "any statutory scheme which draws a sharp line between the sexes, solely for the purpose of achieving administrative convenience, necessarily commands 'dissimilar treatment for

men and women who are . . . similarly situated,' and therefore involves the 'very kind of arbitrary legislative choice forbidden by the [Constitution].'" *Frontiero*, 411 U.S. at 691 (quoting *Reed v. Reed*, 404 U.S. 71, 77, 92 S. Ct. 251 (1971)). However, even in light of this general rule, the *Rostker* Court considered and deferred to Congress's administrative concerns. *See Rostker*, 453 U.S. at 81–82; *accord Schlesinger*, 419 U.S. at 507–08. The Court distinguished past precedent by noting that the previous classifications "were based on overbroad generalizations" but that, in contrast, Congress's choice to retain the MSSA was based on "judgments concerning military operations and needs." *Id.* at 67–68 (quotations omitted). Thus, *Rostker* affirms that administrative concerns may justify statutory gender classifications in service of Congress's broad power over military affairs.

Congress cited several administrative concerns in its 1980 rejection of adding women to the draft. The primary concern, again, centered around administrative difficulties caused by the ban on women in combat. S. Rep. No. 96-826, at 156–61; *see also id.* at 157 ("The policy precluding the use of women in combat is, in the Committee's view, the most important reason for not including women in a registration system."). The Committee had also expressed concern that "training would be needlessly burdened by women recruits who could not be used in combat." *Rostker*, 453 U.S. at 81 (quoting S. Rep. No. 96-226, at 9 (1979)). However, as previously discussed, women are now eligible for and have been integrated into combat units. Thus, although Congress was previously concerned about drafting large numbers of people who were categorically ineligible for combat, this concern factually no longer justifies the MSSA.

However, according to Defendants, Congress also worried about administrative problems caused by "women's different treatment with regard to dependency, hardship[,] and physical standards." *Id.* at 28; S. Rep. No. 96-826, at 159. Defendants emphasize that Congress's concern about the physical readiness of women for combat has not changed. Dkt. 80 at 28–29. Defendants

point to an acknowledgment by the Department of Defense that "[t]hose who are opposed" to female mandatory registration believe "it would be inefficient to draft thousands of women when only a small percentage would be physically qualified to serve as part of a combat troop." Dkt. 80 at 28; Dkt. 73-1 at 145–46 (Department of Defense, Report on the Purpose and Utility of a Registration System for Military Selective Service, 2017). Therefore, "if men will, for the foreseeable future, comprise the predominant percentage of persons serving in combat forces, then the basis for the MSSA has not materially changed." Dkt. 80 at 29; *see Tuan Anh Nguyen v. INS*, 533 U.S. 53, 73, 121 S. Ct. 2053 (2001) (noting that equal protection principles do not prohibit acknowledgment of biological differences between genders).

Again, however, this argument falls short. At the outset, concerns about female physical ability do not appear to have been a significant factor in Congress's decision-making process regarding the MSSA. Instead, Congress mentioned concerns about female physical ability in passing, within a list, in one sentence of Defendants' cited report. S. Rep. No. 96-826, at 159. In contrast, Congress extensively discussed the ban on women in combat. *Id.* at 156–61. Congress also focused on the societal consequences of drafting women, such as the perceived impropriety of young mothers going off to war and leaving young fathers to care for children. *Id.* at 159. Defendants' evidence simply does not support the argument that Congress preserved a male-only draft because of concerns about female physical ability. Again, while the court must defer to Congress, the court does not have to defer to proffered justifications that have little, if anything, to do with Congress's actual judgment on the matter. *See Morales-Santana*, 137 S. Ct. at 1696–97 (quoting *Virginia*, 518 U.S. at 533, 535–36) ("It will not do to 'hypothesiz[e] or inven[t]' governmental purposes for gender classifications '*post hoc* in response to litigation.'").

Further, under *Rostker*, the dispositive issue is whether men and women are *similarly situated* in regard to the draft. *Rostker*, 453 U.S. at 79. Thus, the relevant question is not what proportion of women are physically eligible for combat—it may well be that only a small percentage of women meets the physical standards for combat positions. However, if a similarly small percentage of men is combat-eligible, then men and women are similarly situated for the purposes of the draft and the MSSA's discrimination is unjustified. Defendants provide no evidence that Congress ever looked at arguments on this topic and then made a "studied choice" between alternatives based on that information. *Cf. id.* at 71–72.

Had Congress compared male and female rates of physical eligibility, for example, and concluded that it was not administratively wise to draft women, the court may have been bound to defer to Congress's judgment. Instead, at most, it appears that Congress obliquely relied on assumptions and overly broad stereotypes about women and their ability to fulfill combat roles.[6] Thus, Defendants' second proffered justification appears to be an "'accidental by-product of a traditional way of thinking about females,'" rather than a robust, studied position. *Rostker*, 453 U.S. at 74 (quoting *Califano v. Webster*, 430 U.S. 313, 320, 97 S. Ct. 1192 (1977)).

In short, while historical restrictions on women in the military may have justified past discrimination, men and women are now "similarly situated for purposes of a draft or registration for a draft." *Rostker*, 453 U.S. at 78. If there ever was a time to discuss "the place of women in the Armed Services," that time has passed. *Id.* at 72. Defendants have not carried the burden of showing

---

[6]The average woman could conceivably be *better* suited physically for some of today's combat positions than the average man, depending on which skills the position required. Combat roles no longer uniformly require sheer size or muscle. Again, Defendants provide no evidence that Congress considered evidence of alleged female physical inferiority in combat—either in 1980 or 2016—and concluded that drafting women was unwise based on that evidence.

that the male-only registration requirement continues to be substantially related to Congress's objective of raising and supporting armies.

## IV. Conclusion

Defendants' motion to stay and motion for summary judgment (Dkt. 80) is DENIED. Although Plaintiffs' complaint requests injunctive relief, Plaintiffs have not briefed the issue and their summary judgment motion only requests declaratory relief. Dkt. 60 at 13; Dkt. 73 at 24. Therefore, Plaintiffs' request for an injunction (Dkt. 60) is DENIED. Plaintiffs' motion for summary judgment (Dkt. 73) is GRANTED.

Signed at Houston, Texas on February 22, 2019.

_____
Gray H. Miller
Senior United States District Judge